UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Civil Action No. 9:19-cv-80531-DMM

JOHN DREWES, JAMES DREWES
(as Trustee of the Drewes Family Trust),
and JAMES DREWES,

Plaintiffs,

vs.

CETERA FINANCIAL GROUP, INC. and
ADAM ANTONIADES,

Defendants.
_____/

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

Plaintiffs, JOHN DREWES, JAMES DREWES, as Trustee of the Drewes Family Trust
(collectively John Drewes and James Drewes, as Trustee are referred to herein as "John Drewes")
and JAMES DREWES, in his personal capacity, by and through their undersigned counsel, hereby
file their Amended Complaint and Jury Demand against Defendants CETERA FINANCIAL
GROUP, INC. and ADAM ANTONIADES, state as follows:

## <u>INTRODUCTION</u>

1.      For over twenty-five years, Legend Advisory, L.L.C. and Legend Group Holdings,
L.L.C. (referred collectively here as "Legend") made a business in the financial industry by
partnering with individuals who had assembled a significant base of clients. One of the ways that
Legend attracted them was what it offered as a "Financial Security Program" ("Program"). The
Program was marketed as a viable substitute for retirement and/or disability insurance, and Legend
never hesitated to remind its partners how prosperous and secure the Program made them.

2.      The Program existed not only as a contractual obligation to Legend representatives and the owners of Legend branch organizations but was also a fiduciary obligation between Legend and these owners. The business interests of Legend functioned so as to constitute a *de facto* partnership with branch owners, and Legend's commitment to these owners under the Program were such as to assume a custodial role over their businesses, for which Program beneficiaries agreed to pay a custodial fee.

3.      In 2014, Defendant CETERA FINANCIAL GROUP, INC. ("CETERA") acquired control and ownership of Legend and in 2016 negotiated the sale of Legend to Lincoln Investment Capital Holdings, L.L.C. and Lincoln Investment Planning, L.L.C. During this process CETERA, acting under the direction of Defendant ADAM ANTONIADES ("ANTONIADES"), canceled the Program. While CETERA was not party to or direct successor to the contract, it used its control over Legend to effectuate the cancellation of the Program in order that CETERA and ANTONIADES could take the collective value for the program for themselves. In the process CETERA unjustly interfered with well-established and legitimate expectations of numerous valuable business organizations under protection by obligations of contract and trust owed to them by Legend.

4.      One of the victims of this act was an elderly beneficiary of that program, Plaintiff JOHN DREWES, who had just been incapacitated by a major stroke. He and his son, Plaintiff JAMES DREWES, were the controlling shareholders of a Legend Branch located in St. Petersburg, Florida. After the cancellation of the Program, he had nothing to provide for his financial security except that Program, which due to its cancellation, has rendered him destitute and dependent on his family.

2

5.     Though JOHN DREWES attempted to transfer his business to his son JAMES DREWES, that attempt was thwarted by the fraudulent activity of Defendants, Steven Fisher and the Lincoln successor companies and principals, who stole the Drewes family business by establishing a competing branch and transferring Plaintiffs' clients and representatives to that branch. CETERA and ANTONIADES thus interfered with the contractual and fiduciary obligations of Legend, while participating with other individuals and companies in a scheme to deprive the Drewes family of business interests they had built for over twenty years.

6.     This case examines Defendants' liability for imposing themselves upon Legend in the cancellation of the Program, and for the consequences of the cancellation—either viewed as an ongoing scheme and conspiracy, or as a result of false impression created by Defendants leading to and enabling the later misappropriation of the Plaintiffs' business.

## PARTIES, JURISDICTION AND HEARING VENUE

7.     Plaintiff JOHN DREWES is a permanent resident and citizen of the State of Indiana. At the time his causes of action against Defendants arose, he resided in St. Petersburg Florida. There he was the founder of the branch organization formed into a corporation to do business with Legend in Florida (The branch organization is hereafter referred to as the "Branch").

8.     Plaintiff JAMES DREWES, as Trustee is the authorized representative of the Drewes Family Trust that has received an irrevocable assignment of a significant portion of rights to future receipts from the Program as outlined below and is identified as the successor beneficiary of Plaintiff JOHN DREWES for the Program. The Trust was formed on April 8, 1999, in Florida and under its laws. Since all the assets associated with and assigned to the Trust that give its trustee standing to sue are Plaintiff JOHN DREWES' claims against Defendants, the Trust, Trustee and John Drewes (shall collectively be referred to as "JOHN DREWES.")

9.     Plaintiff JAMES DREWES in his personal capacity is an associated person and registered representative of Lincoln Investment Planning, L.L.C., a shareholder in the Branch. Plaintiff JAMES DREWES is a permanent resident and citizen of the State of Florida and was at the time these causes of action arose, a shareholder of the Branch, and one of its managing agents.

10.     Related individuals and entities who are not named in this Amended Complaint have jointly requested that this matter be submitted to arbitration, and their request was granted by order of the Arizona Superior Court, Pima County, by the Honorable D. Douglas Metcalf on January 24, 2019. Defendants are not FINRA members and/or do not seek to be included in the FINRA arbitration process.

11.     Upon information and belief, CETERA is incorporated in the State of Delaware and is headquartered as its principal place of residence in the Segundo Beach, California.

12.     At the time the claim described in this Amended Complaint arose, Plaintiffs are informed and believe that CETERA had assumed ownership and control of Legend, along with its assets and liabilities, and in a manner not yet discovered, retained, apportioned, or shared Legend's liabilities with Legend's purchaser, Lincoln Capital Holdings, L.L.C.

13.     A major feature in Plaintiffs' claim of conspiracy in this action is that CETERA took measures to conceal the exact nature of the liability transfer between Legend and Lincoln in order to suppress and confuse resistance and outrage to the brazen act of theft perpetrated during the transaction. These efforts to conceal have continued in other litigation forums at the direction of CETERA's counsel.

14.     At all times relevant to this action, CETERA was directed in its acts by ANTONIADES, who served at the President and Chief Executive Officer of CETERA.

15.     Upon information and belief, ANTONIADES is a permanent resident and citizen of the State of California. The tortious acts constituting intentional interference with contract and prospective advantage, inducement to breach fiduciary duties, constructive fraud, abuse of the elderly and conspiracy (as described herein) were committed by him on behalf of CETERA and for his own personal gain and enrichment.  Some of the acts pursuant to a plan and conspiracy occurred after the transfer of Legend to Lincoln by individuals who participated in the plan, as described herein.

16.     Defendants each committed intentional tortious acts described in this Amended Complaint by entering the State of Florida, either directly on their own or through their appointed agents and conspirators. They also have substantial business contacts with Florida that precede their acts, by virtue of conducting extensive business for each of their benefit, maintaining an office in Boca Raton, Florida, and having taken control of and operating Branch organizations affiliated with Legend, which is headquartered in West Palm Beach, Florida. CETERA sold its wholly owned Legend companies to Lincoln Investment Capital Holdings, L.L.C. and Lincoln Investment Planning, L.L.C (Collectively referred to as "Lincoln").

17.     Edward Forst ("Forst") is the owner and CEO of Lincoln and the individual with whom ANTONIADES negotiated the sale of Legend to Lincoln. He later directed and participated in the effectuation of a plan to misappropriate Plaintiffs' interests.

18.     For purposes of this claim, the term "Legend" is also used to identify the entities that acted prior to their sale on January 3, 2017 to Lincoln. Lincoln is used to identify the entities holding the combined assets and liabilities from the sale of Legend, as well as holding liability for acts committed after the sale.

19.     Steven Fisher ("Fisher") was principal, manager and co-owner of the St. Petersburg Branch, the controlling share of which was owned by Plaintiffs JOHN DREWES and JAMES DREWES. He joined in a scheme and conspiracy to cancel the Program and misappropriate the business interests of Plaintiffs.

20.     The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in the State of Florida, and CETERA has its most significant contacts with the State of Florida in this District by virtue of having its Florida office in the City of Boca Raton, Florida. The principal witnesses associated with the Legend companies (the entity with whom Defendants contractual and fiduciary obligations originated) reside in this District, at Palm Beach Gardens, Florida. Additionally, a related action involving very similar issues of fact and law was brought in this District in February 2019, and is currently pending before the Honorable Kenneth Marra, styled *Cecchini et. al. v. Cetera et al.*, Case no. 9:19-cv-80215-KAM.

### DEFENDANTS' RELATIONSHIP WITH OTHER PERSONS AND ENTITIES

22.     Plaintiffs are informed and believe Defendants colluded and conspired with Forst, Legend and Fisher by forming an agreement with them, as outlined below, to interfere with existing contracts and favorable business relationships, to breach fiduciary obligations, to commit actual and constructive fraud against Plaintiffs and to take advantage of JOHN DREWES' status as elderly and incapable of protecting his interests. They further conspired to take the financial gain from the cancellation of the Program and distribute it among themselves, a plan not limited

to the cancellation of the Program but included anticipated measures to avoid and escape the consequences of it. As such, all acts committed by Forst, Lincoln and Defendants are done on each other's behalf, where each acted as agent of the other in furthering the plan. Moreover, the knowledge of Legend and Lincoln managing agents and officers, acting at the behest of Defendants and in collusion with them are imputed to and shared by Defendants.

23.     Affirmative acts by one or more participants (CETERA, ANTONIADES, Legend, Forst, Lincoln and Fisher) in the above-referenced conspiracy included the cancellation of the Program, the intentional misrepresentation of reasons and/or excuses for the cancellation of the Program, the misappropriation of Plaintiffs' trade secrets and client lists, the fraudulent misrepresentation of intentions to restore branch operation and control to Plaintiffs, the use of fraud, duress and coercion to acquire signatures on releases, and the knowing abuse of Plaintiff JOHN DREWES as an elderly and disabled person protected under Florida law.

24.     Defendants not only joined in the above-referenced conspiracy, but aided and abetted breach of fiduciary duty, actual and constructive fraud, and abuse of JOHN DREWES' status as an elderly and disabled person by, as outlined below, by formulating pretexts to support the cancellation of the Program, circulating release agreements through Fisher and other Legend and Lincoln agents, encouraging and allowing Fisher, Forst, Lincoln and other Lincoln agents to misappropriate Plaintiffs' business, and offering false alibis to Fisher, Forst and Lincoln, and other Lincoln agents who furthered and completed the misappropriation of Plaintiffs' business interests.

25.     Alternatively, Plaintiffs are informed and believe that while Defendants negotiated the sale of Legend to Lincoln, it fraudulently represented or otherwise failed to properly disclose to Forst the liabilities Legend had incurred before the sale, thereby producing the false impression that Lincoln assumed no obligations in its purchase of Legend. In that case, Lincoln's subsequent

actions were not the acts of conspirators, but of persons acting out of ignorance caused by Defendants and thus constituted acts of intentional and/or negligent misrepresentation committed against Plaintiffs.

26.     Also, in the alternative, Defendants assumed all of Legend's liabilities and obligations, as outlined below, for fiduciary duty, breach of fiduciary duty, contract, and breach of contract, as successor to all of Legend's obligations and liabilities occurring in the Purchase of Legend, and as alter ego of Legend. CETERA assumed status of alter-ego by purchasing all of Legend's equity, removing its officers and agents from decision-making authority, and substituting itself for Legend in the decision to cancel the Program.  All agents acting on behalf of Legend were acting on behalf of CETERA as CETERA'S agents, and liability for said acts is thereby imputed to CETERA as successor and/or alter ego of Legend.

## **FACTUAL BACKGROUND**

27.     JOHN DREWES had served the securities industry for over twenty years before a stroke required that he terminate his practice in October 2016.  By the time of his stroke, the Branch had over 30 representatives. His compensation was based on the assets under management (AUM) of roughly $250 million, which was then growing at a rate of about $30 million per year due in large part to the fact the reinvestment of those assets was (and is) a lucrative enterprise that their clients continued to assign a significant portion of their annual income into their retirement accounts. The anticipated expansion of AUM was expected to rise by 300 percent or more within ten years. As such, PLAINTIFFS' business was an attractive target of acquisition to competitors, and to Defendants.

28.     JOHN DREWES was recruited in 1994 by Phil Restino, to join with the Legend Group to recruit and serve clients in their specialized field of qualified planning/retirement

planning marketplace. Though the parties agreed to refer to themselves as independent contractors, the nature of the business relationship was so finely interconnected that it operated as a *de facto* partnership, thereby supporting concurrent obligations of confidence and trust. The parties were required, for example, to operate under restrictions preventing them from doing business with each other's competitors, to form a branch organization under shared management, to collect and share revenues placed in a common fund, to jointly represent and advertise branch name with Legend products and services, to attend conferences and training seminars together, to treat clients within a book of business for a given branch as joint responsibilities, to make arrangements upon retirement or cessation of practice to reassign clients with other Legend representatives, and to provide for Legend representatives' retirement and disability needs. As part of the arrangement, Legend agreed to monitor regulatory compliance, to train its agents as to the marketable value of its products, to operate as a referral source for business and to pay branch representatives in accordance with sharing agreements between the branch owners and its representatives.   In describing their relationship, Legend regularly referred to its branch agencies as "partners" and the branch owners as "family."

29.    One of the obligations Legend undertook on behalf of its Branch and its owners was maintenance of licensure for its representatives. It was Legend's responsibility to monitor and update the licenses of its representatives. Its representatives, including JOHN DREWES, relied on them for this fundamental administrative practice.

30.    The Program was an especially strong indicator of a relationship of confidence between Legend and its representatives, because it acknowledged the value and importance of JOHN DREWES' book of business (also referred to as a "book") and the vulnerability he would otherwise have felt in combining his business interests with theirs. The book included their own

personal clients, as well as clients of those representatives that they had hired and trained as employees of the Branch.

31.     Representatives with a developed book of business typically invest years of work in the formation and maintenance of client relationships, and in the recruitment of development of agents who draw clients to the business. The good will associated with those relationships is valuable, and owners of these businesses spend much of their time warding off various encroachments.  These efforts are the means by which they insure the continuity of their business and bargain effectively with existing and potential partners.

32.     The Program was explicitly designed to encourage JOHN DREWES (and his son JAMES DREWES) to relax their vigilance against the theft of their business by competitors, that is, by formally promising that it would never transfer the value of their books to another Legend representative unless they had ceased their practice and were being compensated for their book at an agreed quarterly rate. This served as the primary incentive and reassurance by which Legend representatives agreed to fold their business interests together with Legend's.

33.     The way the Program was designed to function, upon a decision to cease practice at a given branch, JOHN DREWES agreed to surrender his book of business to Legend as its custodian, which would in turn assign those clients to another Legend representative or representatives.  He could, in his sole discretion, alternatively assign his book—along with commission and override rights—to a Legend representative(s) that he trusted, so long as the representative remained with Legend. In exchange for this assignment, Legend agreed to pay most of the fees and overrides associated with those accounts, while taking 25 percent as a custodial fee to a new representative to look after and grow the AUM of those client accounts. In addition to the receipt of a 25 percent fee, the assigned custodians were free to use good will of those relationships

to support the development of new client relationships. The Program was designed to pay 20 years (to the representative or his/her heirs), or to the end of the representative's life—whichever was longer.

34.     The Program was structured to pay (on a quarterly basis) an override equal to 75 percent of the advisory and custodial fees paid to active representative. The Program thus provided as follows:

> **Cessation of Active Solicitation: Advisory and Custodial Fee Income**
>
> Upon the cessation of active solicitation by representative, solicitation fee income will be continued to Representative. The fee income will be paid on any and all accounts of Representative's clients after cessation of active solicitation, at a rate equal to 75% of the rate paid to active representatives under the effective compensation schedule at the time of payment. This amount will be paid only as and if the Group earns and receives the corresponding solicitation fee. The remaining portion of the fee income normally paid to active representatives will be used to retain the business. Similarly, any fee income being received by Representative on an override basis will be paid at a rate equal to 75% of the override rate paid to active representatives receiving override fees under the effective compensation time of payment.

35.     JOHN DREWES relied on Legend's promise of financial security and worked arduously with the understanding that income flowing from his book of business would continue beyond the end of his working life and support him under the pressures of age and illness. He consciously refrained from the development of his own retirement plan and disability insurance because of the belief that the Program would cover his needs. He further encouraged his son, JAMES DREWES, to join the Branch as a Legend representative, and continue with the business that he had built.

36.     Plaintiffs JOHN DREWES' and JAMES DREWES' rights to receive the benefits under the Program were vested rights guaranteed by contract with Legend, and otherwise a right

11

obtained by Legend's repeated use of the Program to recruit and motivate the DREWES and other representatives to work with Legend. In 2014, this contract was reformulated and clarified to the effect that its benefits were guaranteed unless there was a change of regulation that required its cancellation.

37.     Even then, due to its use as a promised basis for the financial security of its representatives, and the assumption of a custodial relationship over the representatives' books of business, Legend held an obligation to maintain the Program with due care to structure it in accord with regulatory standards, and to notify its representatives if and when a change of regulation could alter or compromise benefits under the Program.

38.     As part of his interest in and use of the Program, JOHN DREWES had a formal plan and intention to assign his interests in his book of business, including accounts that would be generating overrides and benefits under the Program, to JAMES DREWES, that his stock interest in the Branch would likewise assign to JAMES DREWES who would be Principal. This plan of succession was communicated to and accepted by Legend, and the right of JOHN DREWES to assign his book to his son was an express and implied right of JOHN DREWES under the terms of his contract with Legend. This right was verified in written statements, and in practices accruing over a period of twenty years, and in Legend's various and repeatedly communicated promotion of Legend benefits and the Program.

39.     When JAMES DREWES Joined the Branch, he acquired his Series 7, 24, 63 and 66 licenses, and worked toward building his own book. In 2001, JOHN DREWES gave JAMES DREWES 10% of corporate stock in the Branch. At the end of 2015, 54% of the corporate stock was held by JOHN DREWES, 10% by JAMES DREWES and 36% by Fisher. At this time, Fisher had assumed the role of Principal of the Branch. As Principal, he was—as described previously—

unquestionably in a fiduciary and confidential relationship with the Branch's shareholders JOHN DREWES and JAMES DREWES. His obligations included loyalty, and precluded him, among other things, from promoting an agency in competition with the Branch, and, of course, stealing away Branch representatives.

40.     In January 2016, Legend stopped paying JOHN DREWES' overrides. It gave as a reason for non-payment that JOHN DREWES' series 65 license had lapsed almost ten years prior. As mentioned previously, the renewal of that license had been the administrative responsibility of Legend and part of its contractual obligation and agreement with the Branch and JOHN DREWES. The failure of Legend to reregister his license was not at first acknowledged as a problem, and did not interfere with his payments, but in January 2016, Legend first treated it as a regulatory obstacle that allowed them to withhold the payment of overrides directly to JOHN DREWES.

41.     The override payments continued, however, to the Branch as a corporate entity under the licensure of its Principal Fisher who was under obligation to pay those earnings to the Branch, and payments were made to JOHN DREWES by Fisher. At that time, he made payments to JOHN DREWES that were significantly less than he had been getting previously, stating that he had to withhold corporate expenses from the distribution. Over that year, JOHN DREWES asked Fisher for an accounting of those expenses and Fisher refused to comply.

42.     Over the course of 2016, JOHN DREWES attempted on multiple occasions to pass the Series 65 exam so that he could restore his license.  These attempts were unsuccessful. On September 2, 2016, while studying for the exam, JOHN DREWES suffered a major stroke and was rendered incapable of performing difficult cognitive tasks such as taking a major licensure examination. At the same time, Fisher stopped payment of income related to his overrides, and

JOHN DREWES contacted Legend and complained. He was, at this point in time, preparing to claim his rights under the Program.

43.     In September 2016, Legend circulated a notice that the Program was canceled. The notice indicated that the decision to cancel the program was based on regulatory concerns. While this notice was signed by the Legend CEO, notice was drafted by CETERA, and circulated by the Legend CEO by their order, and upon penalty of termination.

44.     By asserting pressure of this kind on the CEO and other officers of Legend, Defendants effectively converted Legend representatives into their own managing agents for the perpetration of the wrongs associated with Program cancellation.

45.     Defendants knew, either directly, or indirectly through its managing agents, that the only basis for the alteration or cancellation of the Program was a change of regulation, that Plaintiffs were protected under obligations of trust to be treated by Legend under duties of loyalty, competency and honor.

46.     There was no change of regulation that justified cancellation of the Program, and the Legend representatives providing notice of the cancellation knew there was no such change of regulation.

47.     The claim of a regulatory basis was naught, but an act of fraud designed to persuade representatives to release of their rights under the Program in exchange for small payments worth much less than the value of the Program, and under threat of termination of their contracts.

48.     Defendants and/or their managing agents and conspirators knew that JOHN DREWES was an elderly man who had recently suffered a disabling stroke. This did not cause Defendants to become less aggressive with him, but quite the opposite. Defendants demanded that he sign an agreement to release his rights to the Program worth over $15 million to him in exchange

for a $25,000 payment and "other valuable consideration." The $25,000 payment was for overrides that were already owed but had not yet been paid to JOHN DREWES. It was presented to him by Fisher, who was at the time acting in concert with Defendant and who was using Fisher to manage the aftermath of Program cancellation by using the pretext of regulatory change as a basis on which to negotiate releases to rights under the Program. JOHN DREWES thereby reposed confidence and trust in a custodial relationship that Defendant assumed over his book of business.

49. The "other valuable consideration" referred to arrangements that JOHN DREWES had been making to assign his right to receive overrides to his son JAMES DREWES, and to replace Fisher with JAMES DREWES as the principal of the Branch. JAMES DREWES had all the licenses and qualifications necessary to act as principal of the Branch and was ready willing and able to assume that position.

50. The release agreement was drafted by Defendants and/or their managing agents and submitted to JOHN DREWES on a take it or leave it basis, and no changes were made in it by him. Accordingly, ambiguities in the release are, by law, construed against the Defendants.

51. Within the context of fiduciary obligations, and agreement or advantage taken by the fiduciary must be fair and reasonable to the beneficiary. The exchange of a business interest worth well in excess of $15,000,000 for a $25,000 payment cannot accordingly be deemed fair and reasonable to the beneficiary by any objective standard.

52. That release agreement was, moreover, procured through the fraudulent representation by Defendants that the Program was terminated due to *bona-fide* and legitimate regulatory changes, and through the false and fraudulent promise to assign JOHN DREWES' rights of payment to his son JAMES DREWES, and to place JAMES DREWES in the position of principal of the Branch. The claim of a regulatory basis for the Program's cancellation, as well as

fraudulently procured release were thereafter submitted to Lincoln to support the false claim that JOHN DREWES had lost his rights under the Program.

53.     At the time Legend promised to assign JOHN DREWES' overrides to JAMES DREWES and to replace him as Principal of the Branch, Defendants had no intention to allow Legend to honor the promise. At the time Lincoln assumed control of Legend, Fisher was still the principal of the Branch and within six months, Lincoln stopped payment of overrides to JAMES DREWES and terminated its contract with him.  Lincoln had, in the meantime, formed another branch with Fisher in competition with the Branch, and directed Fisher to take all the representatives and their clients to the newly formed branch. Plaintiffs are informed and believe that this action occurred pursuant to an agreement of cooperation between Defendants, Lincoln and Fisher, that allowed Defendants to fraudulently organize the transfer of business to Lincoln in exchange for benefits in the agreement of purchase between CENTERA and Lincoln. Alternatively, Plaintiffs are informed and believe that Defendants failed to properly disclose its obligations to Lincoln an Forst, and that Lincoln and Forst took aggressive and unwarranted action against Plaintiffs due to mistaken assumptions caused by Defendants' misrepresentations.

54.     In addition to the fraudulent procurement of the release, since the promise of assignment to JAMES DREWES and his placement in the role of principal of the Branch was the "other consideration" contemplated by the release, Lincoln's failure to abide by that promise renders it unenforceable against JOHN DREWES. Notwithstanding the unenforceability of the release, Legend was obligated at Plaintiffs' request to assign JOHN DREWES' overrides to JAMES DREWES, restore JAMES DREWES' control over the Branch and properly inform Lincoln of that obligation.

16

55.    Following the cancellation of the Program, Lincoln opened a competing branch with Fisher as its principal and terminated the broker-dealer contracts with Plaintiffs and their branch representatives.

**FIRST CLAIM FOR RELIEF**
**INTENTIONAL INTERFERENCE WITH CONTRACT, PROSPECTIVE ECONOMIC ADVANTAGE AND FIDUCIARY DUTY**

56.    Plaintiffs reallege and incorporate all preceding allegations set forth above as if fully set forth herein.

57.    There was a business relationship or potential for a relationship with another party, Defendants along with co-conspirators Fisher, Lincoln and Forst, knew about the relationship, and they intentionally and unjustly interfered with or otherwise disrupted the business relationship.

58.    The business relationship was contractual in that it involved a contractual agreement between Legend and Plaintiffs to pay under the Program, and to assure that the revenue from their books would be secure. Additionally, this contractual agreement was embedded in an advantageous business relationship that included long lasting client and employee relationships and fiduciary duties owed between Branch shareholders, and as such constituted a "prospective advantage" that extended well beyond a specific contract and to the accumulated good will of their business interests.

59.    These business interests were further protected by fiduciary relationships associated with the formation of a *de facto* partnership, specific obligations of trust owed by Fisher to Plaintiff as the managing agent of their company, and by specific custodial obligations promised by Legend to attach and protect the "financial security" that their business interests represented.

60.    Defendants knew of these contractual, business and fiduciary expectations and took specific acts to defeat or disrupt those expectations. These acts included the interference with

contractual obligations to provide the Program and contractual obligations to restore control of the Branch to Plaintiffs. The inducement to breach longstanding fiduciary duties included the formulation and communication of a pretextual basis for Program cancellation, the engagement of Forst and Lincoln as participants in the misappropriation of Program benefits, the use of coercive pressure to get Legend to breach its obligations under the Program, and the engagement of Fisher in acts of participation in the cancellation of the Program, which culminated, by design, in the establishment of a competing Branch, and the transfer of representatives and personnel to the competing branch.

61.     As a direct and proximate consequence of these acts, Plaintiffs have and will continue to suffer damages in amounts to be proved at trial.

62.     The conduct described above was wanton, malicious and fraudulent, thereby justifying an award of punitive damages in amounts to be proved at trial.

## SECOND CLAIM FOR RELIEF
## CONSTRUCTIVE FRAUD, BREACH OF FIDUCIARY
## DUTY BY WAY OF SUCCESSOR LIABILITY, ALTER-EGO, CONSPIRACY AND
## AIDING AND ABETTING

63.     Plaintiffs reallege and incorporate all preceding allegations set forth above as if fully set forth herein.

64.     As described before, Legend's business relationship with Plaintiffs was a confidential relationship consisting in its *de facto* partnership and in the reposing custodial care over of a book of business surrendered voluntarily under the promises evident in the Program.

65.     Also as described above, Fisher had a fiduciary duty as acting Principal of the Branch of which Plaintiffs held a majority interest.  Even more than with Legend and Lincoln, Fisher stood in a confidential relationship with Plaintiffs.

66.     The duties associated with the confidential relationship were breached by Legend in failing to exercise diligence over the maintenance of JOHN DREWES' license, the failure to properly assure compliance on which JOHN DREWES' financial security depended with regulatory standards, the pretextual cancellation of the Program, the fraudulent procurement of release agreements, and the misappropriation of JOHN DREWES' business representatives and clientele.

67.     Defendants asserted their own will and purpose in a plan to influence Legend to deprive Plaintiffs' business and displacing the will and judgment of Legend and Fisher. In doing so, Defendants assumed Legend's and Fishers' obligations as its own, as successor to their obligations, alter-ego to Legend, and engaging Legend in a principal-agent relationship. Defendants thus became constructive trustees of Plaintiffs' interests.

68.     Violation of obligations of trust, loyalty and the competent preservation of Plaintiffs' interests as described above, in addition to obligations assumed under laws of contract, were assumed equitably by virtue of the assumption of control over the trustee obligations of others. Defendants are thereby equitably estopped from denying those obligations.

69.     Notwithstanding their obligations as principal and successor to the acts of Legend Defendants assume liability for the above enumerated acts of Legend, Forst, Lincoln and Fisher as co-conspirators with them. Moreover, Defendants acts aided and abetted breach of fiduciary duty and constructive fraud through the formulation and communication of pretext for program cancellation, procuring releases under pretext, and encouraging Fisher to fraudulently obtain releases and to misappropriate the Drewes' business interests.

70.     As a direct and proximate consequence of these acts, Plaintiffs have and will continue to suffer damages in amounts to be proved at trial.

71.     The conduct described above was wanton, malicious and fraudulent thereby justifying an award of punitive damages in amounts to be proved at trial.

### THIRD CLAIM FOR RELIEF
### EXPLOITATION OF AND CONSPIRACY
### TO EXPLOIT AN ELDERLY ADULT OR DISABLED PERSON IN
### VIOLATION FLORIDA STATUTE 825.103

72.     Plaintiffs reallege and incorporate all preceding allegations set forth above as if fully set forth herein.

73.     Plaintiffs have submitted a demand pursuant to Florida Statute Section 772.11. That demand was rejected.

74.     While committing the above-referenced acts, Defendants along with co-conspirators Fisher, Lincoln and Forst knew that JOHN DREWES was both elderly and disabled, and lacked the capacity to consent to the release of his interests and the loss of his business.

75.     Defendants violated Florida Statute 825.103 by standing in a business and/or fiduciary relationship with JOHN DREWES, obtaining and taking his assets and property with the intent to deprive him of the use, benefit, or possession them, and conspiring with another to obtain and use of JOHN DREWES' funds, assets, or property, with the intent to deprive him of the use, benefit, or possession them or to benefit someone other than JOHN DREWES.

76.     Defendants further violated the Statute by cancelling his rights under the Program without cause, committing fraud in obtaining their rights of control over his assets, imposing upon him a release agreement through fraud and duress, failing to respect his assignment of accounts and control over his business assets to his son, misrepresenting to Lincoln through the so called "release" along with other representations, Legend's and CETERA's obligations to him, and transferring his business interests to a competing branch.

77. The acts indicative of conspiracy is the same as those identified in conspiracy allegations for the commission of torts of Interference, Constructive Fraud, and Breach of Fiduciary Duty set forth above. Moreover, acts committed before Defendants' sale to Forst and Lincoln, enable and assisted Forst, Lincoln and Fisher in their misappropriation of Plaintiffs' business interests, leaving JOHN DREWES vulnerable to those acts. These acts would not have occurred but for Defendants' acts.

78. As a direct and proximate consequence of these acts, Plaintiff JOHN DREWES has and will continue to suffer damages in amounts to be proved at trial.

79. The conduct described above was wanton, malicious and fraudulent thereby justifying an award of treble and/or punitive damages in amounts to be proved at trial.

## FOURTH CLAIM FOR RELIEF
### INTENTIONAL AND NEGLIGENT MISREPRESENTATION

80. Plaintiffs reallege and incorporate all preceding allegations set forth above as if fully set forth herein.

81. As more fully described above, Defendants materially misrepresented the reasons for the cancellation of the Program and of its intention to and preserve JOHN DREWES' business interests for his and his son's benefit. In making these representations Defendants knew or should have known that the representations were false.

82. Moreover, Defendants communicated falsely as to those facts to Lincoln, knowing that Plaintiffs would be adversely impacted by the misrepresentation.

83. Defendants made these representations in the course of a fiduciary relationship where diligent, competent and open disclosure was required.

84.     Lincoln's misrepresentations and omissions were intended to, and did in fact, induce Plaintiffs to place their business in the custody of Defendants, and later, to relax efforts to consolidate control over their book of business.

85.     As a direct and proximate consequence of these acts, Plaintiffs have and will continue to suffer damages in amounts to be proved at trial.

86.     The conduct described above was wanton, malicious and fraudulent thereby justifying an award of punitive damages in amounts to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF PROMISSORY OBLIGATIONS OF LEGEND BY WAY OF SUCCESSOR LIABILITY, ALTER-EGO AND EQUITABLE ESTOPPEL**

87.     Plaintiffs reallege and incorporate all preceding allegations set forth above as if fully set forth herein.

88.     Plaintiffs are informed and believe that Defendant CETERA assumed the promissory obligations of Legend, either partially, completely or by way of an agreement of indemnification—the exact terms of which have heretofore remained undisclosed.

89.     Legend had the following promissory obligations: (1) the diligent provision of administrative services needed in submitting licensing renewal applications for JOHN DREWES; (2) the competent and diligent review of regulations necessary to effectuate the Program, or its equivalent; (3) timely notification of regulatory concerns about the Program; and (5) the maintenance and extension of the Program to Plaintiffs.

90.     Each of these obligations were a material term of a contract between Legend and Plaintiffs.

91.     Notwithstanding contractual obligation on these terms, Legend had promised to supply these benefits, Plaintiffs relied on these promises to their detriment, by relaxing control

over their books, working arduously for many years in an attempt to develop benefits offered, avoiding business relationships with other broker dealers, and refraining from the pursuit of other retirement and disability options available to them, such that Legend was obligated to provide them, or their equivalent..

92.    Legend and CETERA breached these obligations.

93.    Legend and CETERA breached a covenant of good faith and fair dealing applicable to its obligations.

94.    As a direct and proximate consequence of these acts, Plaintiffs have and will continue to suffer damages in amounts to be proved at trial.

**WHEREFORE**, Plaintiffs, JOHN DREWES, JAMES DREWES as Trustee of the Drewes Family Trust and in his personal capacity, respectfully request that the Court enter judgment in their favor and against Defendants CETERA FINANCIAL GROUP, INC. and ADAM ANTONIADES jointly and severally, and award the following relief to the fullest extent allowed by law:

a.    Compensatory economic and non-economic and consequential damages;

b.    Punitive damages, as allowed;

c.    Treble damages as allowed under law for abuse of the elderly and disabled;

d.    injunctive and/or declaratory relief;

e.    Pre-judgment and post-judgment interest at the highest lawful rate and adjustment for tax consequences;

f.    Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

g.    Any such relief as justice allows.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 24th day of May 2019.

Respectfully submitted,

*s/ Jonathan C. Chane*
Jonathan C. Chane (FBN #0125581)
Chane Socarras PLLC
11380 Prosperity Farms Road, Suite 204
Palm Beach Gardens, Florida 33410
Telephone: 561-308-9552
jchane@cslawfl.com

*s/ Peter G. Friesen*
Peter G. Friesen, admitted *pro hac vice*
Jeremy A. Sitcoff, admitted *pro hac vice*
LEVIN SITCOFF PC
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone: (303) 575-9390
Fax: (303) 575-9385
pgf@levinsitcoff.com
jas@levinsitcoff.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 24, 2019, the foregoing document was filed with the Clerk of the Court using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of the Notice of Electronic Filing generated by CM/ECF.

By: <u>/s/ Jonathan C. Chane</u>
     JONATHAN C. CHANE, ESQ.
     CHANE SOCARRAS, PLLC
     11380 Prosperity Farms Road, Suite 204
     Palm Beach Gardens, Florida 33410

**<u>Service List</u>**

**Alex J. Sabo, Esq.**
200 S. Biscayne Blvd., Suite 2401
Miami, FL 33131
asabo@bressler.com
*Attorneys for Defendants Cetera Financial Group, Inc. and Adam Antoniades*