UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Civil Action No. 9:19-cv-80531-DMM

JOHN DREWES, JAMES DREWES
(as Trustee of the Drewes Family Trust),
and JAMES DREWES,

Plaintiffs,

vs.

CETERA FINANCIAL GROUP, INC. and
ADAM ANTONIADES,

Defendants.
_____/

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, John Drewes ("John"), James Drewes (as Trustee of the Drewes Family Trust) (the "Trustee") and James Drewes, in his personal capacity ("James") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file their Second Amended Complaint and Jury Demand against Defendants Cetera Financial Group, Inc. ("Cetera") and Adam Antoniades ("Antoniades") (collectively, "Defendants") and state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      John is an adult resident and citizen of the State of Indiana.

2.      The Trustee is the authorized representative of the Drewes Family Trust, which has received an irrevocable assignment of a significant portion of rights to future receipts from the Program (as defined below) and is identified as the successor beneficiary of John. The Trust was formed on April 8, 1999, in Florida and under its laws. Because all the assets of the Trust that give its trustee standing to sue are John's, the Trustee and John shall hereinafter collectively be referred to as "John."

3.      James is an adult resident of the State of Florida.

4.      Cetera is a Delaware corporation with its principal place of business in Segundo Beach, California.

5.      Upon information and belief, Antoniades is an adult resident of the State of California.

6.      The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in the State of Florida.  Cetera has its most significant contacts with the State of Florida in this district by virtue of having its Florida office in the City of Boca Raton, Florida.  Additionally, Defendants Cetera and Antoniades each committed intentional tortious acts described in this Second Amended Complaint by entering the State of Florida, either directly or through their appointed agents.

## GENERAL FACTUAL ALLEGATIONS

8.      For over twenty-five years, Legend Advisory, L.L.C. and Legend Group Holdings, L.L.C. (collectively, "Legend") conducted business by partnering with individuals in the financial industry who had assembled a significant base of clients. One of the ways Legend attracted these individuals was through its "Financial Security Program" (the "Program").

9.      The Program was marketed as a viable substitute for retirement and/or disability insurance. Legend knew that several of its competitors offered their own versions of the Program that were equal in structure and payout to the Program Legend offered, and that maintaining its

own Program was necessary to avoid losing its sales force (along with their clients) to those competitors.

10.    John was recruited in 1994 by Legend's founder to recruit and serve clients in Legend's specialized field of qualified planning/retirement planning marketplace.

11.    The arrangement between John and Legend was a contract, pursuant to which John agreed to bring his skill, expertise and client base to Legend, and agreed to solicit clients and representatives to a branch organization owned by John so that they would purchase financial products in the form of mutual funds and advisory services from Legend.  James subsequently joined John as founder of that branch organization (hereinafter, the "Branch"), which they formed to do business with Legend in Florida.  James became a managing agent of the Branch and a registered representative of a shareholder in the Branch.

12.    Pursuant to their arrangement, it was Legend's responsibility to monitor, register and update the branch managers' licenses. John and James, as Legend's representatives, relied on Legend to do so.  Legend also undertook the handling of regulatory issues, of which it represented to Plaintiffs it had a special expertise.  Compliance with Legend's recitation of applicable regulations were a paramount obligation of Branch managers such as John and James, and accordingly, John and James were required to and did in fact defer to Legend's statements about regulatory matters.

13.    John and James co-owned the Branch with Steven Fisher ("Fisher") who held a minority interest in the Branch.  The controlling share of the Branch, however, was owned by John and James.  Fisher acted as administrative supervisor and liaison to Legend.

14.     Though the parties agreed with Legend to refer to themselves as independent contractors, the nature of the business relationship was so finely interconnected that it operated as a *de facto* partnership, resulting in concurrent obligations of confidence and trust.

15.     For example, under the contract, the parties were required to operate under restrictions preventing them from doing business with each other's competitors, to form a branch organization under shared management, to collect and share revenues placed in a common fund, to jointly represent and advertise with Legend products and services, to attend conferences and training seminars together, to treat clients within a book of business for a given branch as joint responsibilities, to make arrangements upon retirement or cessation of practice to reassign clients to other Legend representatives, and to provide for Legend representatives' retirement and disability needs.

16.     Legend, in turn, agreed to monitor regulatory compliance, to train its agents as to the marketable value of its products, to operate as a referral source for business and to pay branch representatives in accordance with sharing agreements between the branch owners and its representatives.

17.     Legend's commitment to Plaintiffs as Branch owners under the Program also included assuming a custodial role over their business, for which Plaintiffs agreed to pay a custodial fee. Legend's obligations under the Program were expensive, but cancellation of the Program presented the risk that Legend would lose its representatives and clients, or otherwise face significant liabilities.

18.     The Program was structured to pay (on a quarterly basis) an override equal to 75 percent of the advisory and custodial fees paid to active representatives. In the event a representative such as John ceased to practice at a given branch, the Program provided as follows:

**Cessation of Active Solicitation: Advisory and Custodial Fee Income**

Upon the cessation of active solicitation by representative, solicitation fee income will be continued to Representative. The fee income will be paid on any and all accounts of Representative's clients after cessation of active solicitation, at a rate equal to 75% of the rate paid to active representatives under the effective compensation schedule at the time of payment. This amount will be paid only as and if the Group earns and receives the corresponding solicitation fee. The remaining portion of the fee income normally paid to active representatives will be used to retain the business. Similarly, any fee income being received by Representative on an override basis will be paid at a rate equal to 75% of the override rate paid to active representatives receiving override fees under the effective compensation time of payment.

The Program was designed to pay 20 years (to the representative or his/her heirs), or to the end of the representative's life—whichever was longer.

19.     In describing their relationship, Legend regularly referred to its branch agencies as "partners" and the branch owners as "family."  For over twenty years, Plaintiffs reposed confidence in Legend and Legend accepted their trust on matters essential to the business, thereby creating a fiduciary relationship.  Legend exploited this relationship to assert a position of domination and control over Plaintiffs' business assets and products.

20.     John's book of business, which was the lifeblood of the Branch, included his own personal clients, as well as clients of those representatives that Plaintiffs had hired and trained as employees of the Branch.  Despite that sharing his book would have otherwise exposed Plaintiffs' business to vulnerability, because of the Program, in which Plaintiffs had been induced to develop the utmost confidence and trust, John shared it with Legend.

21.     John relied on Legend's promise of financial security and worked arduously with the understanding that income flowing from his book of business would continue beyond the end of his working life and support him under the pressures of age and illness. He consciously refrained

from the development of his own retirement plan and disability insurance because of Legend's representation that the Program would cover his needs.

22.     Through the Program, Legend promised that it would never transfer the value of John and James' books to another Legend representative unless they had ceased their practice and were being compensated for their books at an agreed quarterly rate. This served as the primary incentive and reassurance by which Legend representatives such as Plaintiffs agreed to fold their business interests together with Legend's.

23.     In or around 2014 or 2015, Cetera acquired control and ownership of Legend. During this time, to obtain operation and control of the Branch, Cetera and Antoniades caused Legend to stop paying John's overrides. It was at this time John discovered that Legend's administrative staff had failed to register or renew his Series 65 examination, despite Legend's obligation to do so.  Legend then used the lack of registration of John's Series 65 license as a reason for non-payment of John's overrides, even though John had retained his Series 6 license, which was sufficient for him to receive overrides under the existing regulations.

24.     Antoniades perpetrated this injustice by falsely representing to Legend personnel that John's Series 6 license, without a Series 65, was insufficient to pay his overrides. Antoniades made that representation to Legend personnel with the intent and expectation that it would be communicated to John and induce him to acquiesce to the non-payment, or take non-payment as a prompt to move his business elsewhere.

25.     Antoniades also caused Legend, through Fisher, to significantly reduce the distributions John was receiving through his corporate ownership of the Branch, under the false pretense that Fisher had to withhold corporate expenses from the distribution. Eventually at

Antoniades' direction, these distributions were also cancelled, under the false pretense that overrides to the Branch were no longer allowed by applicable regulations.

26.     In 2016, Cetera negotiated the sale of Legend to Lincoln Investment Capital Holdings, L.L.C. and Lincoln Investment Planning, L.L.C. (collectively, "Lincoln").[1] Edward Forst ("Forst") is the owner and Chief Executive Officer of Lincoln and the individual with whom Antoniades negotiated the sale of Legend. Forst later directed and participated in the plan to misappropriate Plaintiffs' interests in the Program and the Branch.

27.     During this process Cetera, acting under the direction of its President and Chief Executive Officer, Antoniades, caused Legend to cancel the Program, stating that it was no longer supported by regulatory guidance. In making this statement, Defendants intended to discourage opposition and dissent among managers suffering loss, intending to discourage them from moving their books of business to competitors and induce them to eventually release their claims against Legend.

28.     In actuality, there was no regulation or change of regulation that justified cancellation of the Program, and Cetera and Antoniades knew it.

29.     In the purchase agreement between Cetera and Lincoln for the purchase and sale of Legend, the parties expressly set forth not only how the gains and liabilities of the Program cancellation would be shared, but also the process by which first Cetera and Antoniades, and later Lincoln, would take measures to prevent branch owners, including John and James, from moving their books of business to competitors of Legend who offered similar programs.

---

[1] For purposes of this Second Amended Complaint, the term "Legend" is also used to identify the entities that acted prior to Legend's sale to Lincoln on January 3, 2017. "Lincoln" is used to identify the entities holding the combined assets and liabilities from the sale of Legend, as well as liability for acts committed after the sale.

30.     Defendants were thus able to take the collective value for the Program for themselves and, in a manner subsequently discovered, retained, apportioned, or shared Legend's liabilities, including those associated with cancelling the Program, with Lincoln.

31.     John and James' rights to receive the benefits under the Program, however, were vested rights guaranteed by contract with Legend.  Legend had no authority to unilaterally cancel the Program.

32.     As part of his interest in and use of the Program, John had a formal plan and intention to assign his interests in his book of business, including accounts that would be generating overrides and benefits under the Program, to James, and that his stock interest in the Branch would likewise assign to James who would be majority shareholder and Principal.

33.     This plan of succession had been communicated to and accepted by Legend, and the right of John to assign his book to his son was an express and implied right of John under the terms of his contract with Legend. This right was verified in written statements, and in practices accruing over a period of twenty years, and in Legend's various and repeatedly communicated promotion of Legend benefits and the Program. Legend solicited and received this plan of succession, made no requests for its modification or clarification, and allowed John and James to proceed with their business affairs on the premise that the plan of succession would be honored.

34.     Upon learning that the Program was to be cancelled, John's attempts to transfer his business to James was thwarted by Fisher and Forst who stole the business by establishing a competing branch and transferring Plaintiffs' clients and representatives to that branch.  In doing so, Defendants set in motion a series of events that enabled the subsequent theft of Plaintiffs' business.

8

35.     These measures included misrepresenting to branch owners that the Program was not compliant with regulations and that therefore neither the Program nor its financial equivalent were legally available to Branch owners. Additionally, anticipating the potential loss of representatives due to Program cancellation, Defendants placed administrative constraints on branch owners' ability to transfer clients to competitors.  Specifically, Defendants threatened not to pay John and James on existing obligations, to terminate broker-dealer contracts and to sue them.

36.     Defendants also misappropriated Plaintiffs' trade secrets and client lists, coercively obtained signatures on releases from John, who they knew had become disabled as a result of his stroke, and ultimately assisted Fisher and Lincoln in stealing Plaintiffs' business.

37.     Lincoln, Fisher and Forst acted in collusion with Defendants to effectuate this scheme.

38.     On September 2, 2016, while studying for the Series 65 exam so that he could restore his license because Legend had allowed it to lapse, John suffered a major stroke and was rendered incapable of performing difficult cognitive tasks, including effectively negotiating or opposing contractual terms with Legend, or moving his business to another broker dealer. He was also 77 years old.

39.     By the time of his stroke, the Branch had over 30 representatives. His compensation from Legend was based on the assets under management ("AUM"), which were valued at roughly $250 million, and which were growing at a rate of about $30 million per year.   The anticipated expansion of AUM was expected to rise by 300 percent or more within ten years.

40.     As such, Plaintiffs' business was an attractive target of acquisition to competitors, and to Defendants.

41.     Seizing on John's debilitated state, Defendants demanded that he sign an agreement to release his rights to the Program—at that point worth over $15 million to him—in exchange for a $25,000 payment and "other valuable consideration."  The $25,000 payment was for overrides that were already owed to him but had not yet been paid.

42.     The release was presented to him by Fisher, who was at the time acting in concert with Cetera and Antoniades.   The "other valuable consideration" referred to arrangements that John had been making to assign his right to receive overrides to his son James, and to replace Fisher with James as the principal of the Branch. James had all the licenses and qualifications necessary to act as principal of the Branch and was ready willing and able to assume that position.

43.     The release agreement was drafted by Defendants and submitted to John on a "take it or leave it" basis, and no changes were permitted to be made to it by him.

44.     Because of their fiduciary relationship, however, Cetera, through Legend, was obligated to be fair and reasonable to John. The exchange of a business interest worth well in excess of $15,000,000 for a $25,000 payment cannot, by any objective standard, be deemed fair and reasonable in this case.

45.     That release agreement was, moreover, procured through the fraudulent representation by Defendants that the Program was terminated due to *bona-fide* and legitimate regulatory changes, and through the false and fraudulent promise to assign John's rights of payment to his son James, and to place James in the position of principal and controller of the Branch.

46.     At the time Legend promised to assign John's overrides to James and to replace him as principal and controller of the Branch, Defendants had no intention to allow Legend to honor the promise. Neither Legend nor Lincoln made the promised transfer of control, and 15

10

months later, Lincoln cancelled payments to James claiming that it had "no contractual basis" for such payments.

47.    By July 2018, Lincoln had formed another branch with Fisher in competition with the Branch, and directed Fisher to take all the representatives and their clients to the newly formed branch.

48.    In addition to the fraudulent procurement of the release, since the promise of assignment to James and his placement in the role of principal of the Branch was the "other consideration" contemplated by the release, Lincoln's failure to abide by that promise renders it unenforceable against John. Legend was obligated at Plaintiffs' request to assign John's overrides to James, restore James' control over the Branch and properly inform Lincoln of that obligation.

49.    Following the cancellation of the Program, Lincoln opened a competing branch with Fisher as its principal and terminated the broker-dealer contracts with Plaintiffs and their branch representatives.

**COUNT I**
**INTENTIONAL INTERFERENCE WITH CONTRACT**
**BY ALL PLAINTIFFS AGAINST CETERA AND ANTONIADEAS**

50.    Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

51.    There was a contract between John, James and Legend. Defendants Cetera and Antoniades knew of this agreement but claim they were not parties to it.

52.    The business relationship involved a contractual agreement between Legend and Plaintiffs to provide John and James benefits under the Program, to restore control of the Branch to Plaintiffs, and to assign commissions and overrides from John to James.

53.     Defendants Cetera and Antoniades knew of these contractual expectations and took action to interfere with, defeat or disrupt those expectations. These acts were committed by agents acting on behalf of Cetera, and by Antoniades, which included influencing the CEO of Legend to cancel the Program, resulting in the denial of program benefits to John at the time he was incapacitated, and to James at the time Lincoln terminated his representative agreement. Cetera and Antoniades also willfully failed to effectively communicate to Lincoln that Branch control was promised to James, and willfully failed to effectively communicate that James had a contractual right to receive an assignment of John commissions and overrides.

54.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

55.     The conduct described above was wanton, malicious and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

**COUNT II**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES**

56.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

57.     In the alternative, Plaintiffs allege that Cetera intentionally interfered with the advantageous business relationship that existed between Plaintiffs and Legend.

58.     Plaintiffs and Legend had an advantageous business relationship central to the operation and profitability of the Branch.  Plaintiffs had legal rights pursuant to that business relationship, not the least of which included the rights to override commissions and benefits from the Program.

12

59.     Defendants Cetera and Antoniades knew of the business relationship between Legend and Plaintiffs and intentionally interfered with and disrupted it by influencing Legend to cancel John's overrides; cancel John and James' Program benefits; withhold control of the Branch from John and James while instilling that control in Fisher; and by affirmatively stating to Lincoln during and after negotiations its purchase of that Legend had no obligations to restore control of the Branch to Plaintiffs or to assign John's rights of compensation to James.

60.     Defendants Cetera and Antoniades' actions were unjustified in that they were made with an intent to disrupt longstanding obligations of trust between Plaintiffs, Fisher and Legend, with the intent of avoiding liabilities associated with the Program's cancellation, and with the specific intention of depriving Plaintiffs of the value of business interests, business relationships and a retirement and disability Program that had accumulated for over twenty years.

61.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

62.     The conduct described above was wanton, malicious and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

## COUNT III
## INTENTIONAL INTERFERENCE WITH FIDUCIARY DUTY
## BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES

63.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

64.     Plaintiffs' business interests were further protected by fiduciary relationships associated with the formation of a *de facto* partnership and other fiduciary duties accumulating over a long term relationship of trust with Legend, by specific obligations of trust owed by Fisher to John as the managing agent and Principal of their company, by specific custodial obligations

promised by Legend to attach and protect the "financial security" that their business interests represented and by establishing and promoting a relationship of dependency on Legend for regulatory guidance.

65.     Defendants Cetera and Antoniades  knew or should have known of those fiduciary duties, and intentionally interfered with those by influencing Legend to withhold overrides to John, to cancel the Program without offering equivalent financial compensation, and to retain Fisher as Branch Principal and managing representative over Plaintiffs' objections and request to restore control to them as majority shareholders in accordance with their succession plan. Defendants Cetera and Antoniades  also directly engaged Legend and Fisher in the use of fraudulent misstatements, false promises and coercion to obtain a release of liability from John, and the use of that release to falsely communicate to Lincoln that Legend had no continuing legal obligation to the Plaintiffs.

66.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

67.     The conduct described above was wanton, malicious and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

**COUNT IV**
**CONSTRUCTIVE FRAUD (BREACH OF FIDUCIARY DUTY)**
**BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES**

68.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

69.     Legend's business relationship with Plaintiffs was one based on confidence and trust.  Specifically, John reposed confidence in Fisher, as acting principal of the Branch of which

14

Plaintiffs held a majority interest, and Fisher accepted John's trust.  Accordingly, Legend stood in a confidential relationship with Plaintiffs.

70.     Legend breached its fiduciary duty to John by failing to exercise diligence over the maintenance of John's license, failing to properly ensure compliance with regulatory standards on which John and James' financial security depended, failing to pay overrides to John in 2016, ordering the pretextual cancellation of the Program, fraudulently and coercively procuring release agreements from John, failing to restore control of the Branch to Plaintiffs, and failing to properly notify Lincoln of Legend's then-existing obligations to Plaintiffs.

71.     Cetera committed these acts through Legend at the express direction of Antoniades acting on his own and Cetera's behalf.  Legend and Fisher acted as the agents of Cetera, and under control, authorization and order of Antoniades. Indeed, Cetera exercised complete control over Legend's executive officers in the year preceding Program cancellation.

72.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

**COUNT V**
**CONSPIRACY TO COMMITT CONSTRUCTIVE FRAUD**
**(BREACH OF FIDUCIARY DUTY)**
**BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES**

73.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

74.     Plaintiffs stood in a relationship of confidence and trust with Legend and Fisher, and Legend and Fisher constructively defrauded John.  Cetera is liable to Plaintiffs for the constructive fraud of Legend and Fisher because it assumed Legend's liabilities.

75.     Antoniades actively directed the constructively fraudulent acts. The acts that pertain to the withholding of overrides, the cancellation of the Program, and fraudulent and coercive procurement of releases were performed at his direction.

76.     Cetera and Antoniades were the organizers of and/or participants in a conspiracy to constructively defraud Plaintiffs by taking the value of their business interests from them and transferring them to Legend and Fisher. There was an express agreement among Cetera, Antoniades, Lincoln and Fisher to share the benefits appropriated from Plaintiffs' business, as well as the liabilities associated with the taking of that business.

77.     Pursuant to their agreement, they conspired to denounce and avoid all obligations to Plaintiffs while taking what they had assembled for their financial security by committing acts such as the cancellation of assignment payments to James, and the subsequent taking of Plaintiffs' business by opening a competing branch, transferring all of Plaintiffs' representatives to it, and cancelling Plaintiffs' contract with Lincoln.  These overt acts were consistent with and pursuant to the conspiracy.

78.     As the originating co-conspirators, Antoniades and Cetera are liable for their own acts, as well as the acts of Lincoln and Fisher who continue to carry out the strategic plan formulated before the Legend purchase. These acts were part of a larger plan to divest Plaintiffs of a position of control where they might take their business to competitors offering benefits similar to the Program, to avoid liabilities for Program cancellation, and to ultimately separate Plaintiffs from their business in its entirety.

79.     The subsequent acts involving the theft of Plaintiffs' business were a foreseeable consequence of the acts taken that resulted in the loss of John's license, the termination of his

16

override payments, the cancellation of the Program, the fraudulent and coercive procurement of his release, and the misrepresentation of obligations to he and James.

80.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

## COUNT VI
## AIDING AND ABETTING CONSTRUCTIVE FRAUD
## (BREACH OF FIDUCIARY DUTY)
## BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES

81.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

82.     Cetera and Antoniades aided and abetted Fisher in committing constructive fraud against Plaintiffs by perpetuating the Program's cancellation under false pretenses; inciting and encouraging Fisher to procure releases from Plaintiffs through misrepresentation and coercion; making misrepresentations to Lincoln regarding the obligations of Legend to Plaintiffs; and failing to restore control of the Branch to Plaintiffs before Legend was purchased by Lincoln, which ultimately allowed for the theft of Plaintiffs' business, which could not have happened but for that assistance.

83.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

## COUNT VII
## EXPLOITATION OF AN ELDERLY ADULT OR DISABLED PERSON
## INVIOLATION FLORIDA STATUTE 825.103
## BY PLAINTIFFS JOHN AND THE TRUSTEE AGAINST DEFENDANTS CETERA AND
## ANTONIADES

84.     Plaintiffs John and the Trustee restate the allegations of paragraph 1 through 49 as if fully set forth herein.

85.     Under Florida Statute section 772.11, any person who proves by clear and convincing evidence that he has been injured in any fashion by reason of any violation of section 825.103(1) has a cause of action for threefold the actual damages sustained.  Fla. Stat. § 772.11(1) (2019).

86.     Plaintiffs have submitted a demand pursuant to Florida Statute Section 772.11. That demand was rejected.

87.     Since September 2, 2016, John has been an elderly person and incapacitated by stroke within the meaning of Florida Statute 825.103. Legend's knowledge of John's incapacity is imputed to Cetera because Fisher and Legend's chief operating officer, Sashi Mehrotra ("Mehrotra") knew of John's condition and were acting as managing agents of Cetera, as Legend's alter ego, and under the direction of Antoniades.

88.     Defendants violated Florida Statute 825.103 because they had a business relationship with John, who trusted them, and knowingly obtained and took his assets and property with the intent to deprive him of the use, benefit, or possession them.

89.     Defendants further violated the Statute by cancelling John's rights under the Program without cause, committing fraud in obtaining John's rights of control over his assets, imposing upon him a release agreement through fraud and duress, failing to respect his assignment of accounts and control over his business assets to his son, misrepresenting Legend's and Cetera's obligations to him, and transferring his business interests to a competing branch.

90.     As a direct and proximate consequence of these acts, Plaintiffs John and the Trustee have and continue to suffer damages and are entitled to an award of three times the damages they have suffered pursuant to Section 772.11 of the Florida Statutes.

## COUNT VIII
## CONSPIRACY TO EXPLOIT ELDERLY ADULT OR DISABLED PERSON
## IN VIOLATION OF FLORIDA STATUTE 825.103
## BY PLAINTIFFS JOHN AND THE TRUSTEE AGAINST DEFENDANTS CETERA AND
## ANTONIADES

91.     Plaintiffs John and the Trustee restate the allegations of paragraph 1 through 49 as if fully set forth herein.

92.     Defendants Cetera and Antoniades, along with co-conspirators Legend and Fisher, knew that John was both elderly and disabled, and lacked the capacity to consent to the release of his interests and the loss of his business.

93.     Defendants violated Florida Statute 825.103 because they had a business relationship with John, who trusted them, and knowingly obtained and took his assets and property with the intent to deprive him of the use, benefit, or possession them.

94.     The overt acts Defendants committed in furtherance of the conspiracy include the formulation of a plan designed to take business interests of John, James, while offering a small fraction of the value of the taking in return; the execution of an express agreement by which the benefits and liabilities associated with the taking would be shared; specific acts of Program cancellation and release procurement through fraudulent disclosures; and without adequate compensation, as well as later acts designed to escape with the taking by defaulting on promises to assign payments to and vest control in James.

95.     Moreover, acts committed before Defendants' sale to Forst and Lincoln, enabled and assisted Forst, Lincoln and Fisher in their misappropriation of Plaintiffs' business interests, by communicating to them that there was no obligation owed to John or James by Legend.  The later acts that completed the taking of Plaintiffs' business would not have occurred but for acts and organizational input given by Defendants Cetera and Antoniades.

96.     As a direct and proximate consequence of these acts, Plaintiffs John and the Trustee have and continue to suffer damages.

**COUNT IX**
**FRAUDULENT MISREPRESENTATION**
**BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES**

97.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

98.     Defendants Cetera and Antoniades (acting as managing agent for Cetera) made false statements of material fact to Plaintiffs regarding the Program.

99.     Specifically, Defendants misrepresented (1) that John was ineligible to receive overrides because he did not have a Series 65 license, (2) that Legend had "no obligation" to provide Program benefits or their equivalent to John (and many others) due to regulatory prohibitions against it, and (3) that regulatory considerations required that the Program be cancelled, stating, "The Legend Group ("Legend") created the Legend Advisor Financial Security Program (the "Program") with the goal of assisting representatives through retirement. However, having recently completed a review of the Program, we have determined that it is no longer supported by regulatory guidance." All of these statements were false.

100.     Cetera and Antoniades knew or should have known at the time they made these statements to Plaintiffs that the statements were false.

101.     Defendants made the statements to Plaintiffs with the intent to induce John to accept cancellation of the Program as a regulatory matter (to which Legend had assumed responsibility and authority in the past). Antoniades hoped and expected that due to the longstanding dependency of Legend representatives on the regulatory expertise of Legend, these representatives would

20

reassign their commission rights back to Legend, and sign releases of liability to Legend and its affiliated entities in exchange for a severely discounted buyout.

102.    Having been told that the Program was cancelled for regulatory reasons, John sought reassurance that he could make a binding assignment of his commissions and overrides to his son James, and moreover to protect that assignment, that control of the Branch as principal would be transferred to James as well. On those conditions John—who was incapacitated by a stroke—signed a release agreement submitted to him by Mehrotra and Fisher. Mehrotra promised to assign John's compensation to James and to install James as principal of the Branch. He made these promises with no intention of binding Legend or its successors, and apparently later told Lincoln that no such promises were made.

103.    Antoniades' statements materially induced John to take the path of least resistance. With respect to the first fraudulent statement he made, John arranged to have overrides delivered to Fisher, who later failed to pay them to John. These arrangements were premised on the assumed good faith of statements originally made by Antoniades and were passed along to John. With respect to the second and third fraudulent statements made, John again accepted that they were made honestly and in good faith and again sought to accommodate the concerns by transferring his compensation to James and agreeing to sign a release of liability to Legend. But for Antoniades' statements, John would not have signed the release. Also, but for the promises made by Mehrotra, acting on Cetera's behalf, he would not have signed the release. The release has been and is still used by Lincoln as a significant basis for the denial of any obligations to John and James.

104.    In reliance on Defendants' false statements, Plaintiffs have and continue to suffer damages.

**COUNT X**
**NEGLIGENT MISREPRESENTATION**
**BY ALL PLAINTIFFS AGAINST DEFENDANTS CETERA AND ANTONIADES**

105.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

106.     Defendants Cetera and Antoniades (acting as managing agent for Cetera) made false statements of material fact to Plaintiffs regarding the Program.

107.     Specifically, Defendants misrepresented (1) that John was ineligible to receive overrides because he did not have a Series 65 license, and (2) that Legend had "no obligation" to provide Program benefits or their equivalent to John (and many others) due to regulatory prohibitions against it, and (3) that regulatory considerations required that the Program be cancelled, stating, "The Legend Group ("Legend") created the Legend Advisor Financial Security Program (the "Program") with the goal of assisting representatives through retirement. However, having recently completed a review of the Program, we have determined that it is no longer supported by regulatory guidance." All of these statements were false.

108.     Cetera and Antoniades knew or should have known at the time they made these statements to Plaintiffs that the statements were false.

109.     Defendants made the statements to Plaintiffs with the intent to induce Plaintiffs to act on them, and indeed, Plaintiffs did so.

110.     Plaintiffs justifiably relied on Defendants' false statements, and as a result have and continue to suffer damages.

## COUNT XI
## BREACH OF CONTRACT
## BY ALL PLAINTIFFS AGAINST DEFENDANT CETERA

111.    Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

112.    A valid contract exists between John and James, on one hand, and Legend, on the other.

113.    The contract required Legend to perform the following obligations: (1) the diligent provision of administrative services needed in submitting licensing registration and renewal applications for John; (2) the competent and diligent review of regulations necessary to effectuate the Program for John and James, or its equivalent; (3) timely notification to John and James of regulatory concerns about the Program; (4) the establishment of control over the Branch in John and James as majority shareholders in accordance with an approve succession plan and in accord with promises made prior to John's execution of a release; (5) the payment of override compensation to John directly; and (6) the maintenance and extension of the Program to John and James.

114.    Each of these obligations was a material term of the contract between Legend and Plaintiffs.

115.    Plaintiffs gave as consideration for these obligations valuable client contacts, information networks, years of branch management, recruiting and training of representatives, and substantial advisory services.

116.    Plaintiffs satisfied all their obligations under the contract.

117.    Legend breached the contract by failing to properly register John for his Series 65 license, failing to competently and diligently review regulations necessary to effectuate the

Program, failing to notify them of concerns about the Program, failing to establish control over the Branch in John and James as majority shareholders, failing to pay John override compensation, and by failing to extend the Program to John when he was disabled by a stroke and failing to extend the Program to James.

118.     Cetera assumed the contractual obligations of Legend when it assumed ownership and control of Legend.

119.     As a direct and proximate result of breach of contract, John was prevented from receiving promised compensation for commissions and overrides, and John and James lost their ability and right to negotiate with Legend competitors for benefits they had been denied, and ultimately lost their business to Fisher. Accordingly, as a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

## COUNT XII
## PROMISSORY ESTOPPEL
## BY ALL PLAINTIFFS AGAINST DEFENDANT CETERA

120.     Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

121.     Legend affirmatively represented to John and James for more than ten years that Legend would provide them benefits under the Program.

122.     John and James actually relied on these promises to their detriment, by working arduously for many years in an attempt to develop benefits offered, avoiding business relationships with other broker dealers, refraining from the pursuit of other retirement and disability options available to them, and relaxing control over their books of business.

123.     Legend has failed to provide these benefits, or their equivalent, to John and James as promised, which failure has caused them actual harm.

124.    Enforcement of Legend's promises to John and James is required to prevent further injury and avoid injustice to Plaintiffs.

**COUNT XIII**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**BY PLAINTIFFS AGAINST DEFENDANT CETERA**

125.    Plaintiffs restate the allegations of paragraph 1 through 49 as if fully set forth herein.

126.    In every contract there is an implied covenant of good faith and fair dealing requiring that each party to a contract deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party or parties to receive the benefits of the contract.

127.    Plaintiffs and Cetera were parties to a contract in the form of the Program.

128.    Plaintiffs substantially performed their obligations under the contract.

129.    Cetera unfairly interfered with Plaintiffs' rights to receive the benefits of the contract by, among other things:

    a.   committing the aforementioned acts of constructive fraud;

    b.   by failing to give due consideration of John and James' rights of control over their business;

    c.   cancelling important benefits under the Program without reasonable justification,

    d.   giving unsupportable justifications for the denial of payments and benefits under their contract;

    e.   securing a release from John under false pretenses;

    f.   failing to honestly convey their accrued obligations to Lincoln; and

    g.   placing Plaintiffs in a position where Fisher and others could steal their book of business.

130.   In doing so, Cetera breached implied covenant of good faith and fair dealing.  As a direct and proximate consequence of Cetera's actions, Plaintiffs have and continue to suffer damages.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants Cetera Financial Group, Inc. and Adam Antoniades, jointly and severally, and award compensatory economic and non-economic and consequential damages; punitive damages, as allowed; treble damages as allowed under law for abuse of the elderly and disabled; pre-judgment and post-judgment interest; attorneys' fees and costs of this action, including expert witness fees, as appropriate; and any other such relief this Court deems necessary and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

**DATED** this 4th day of February 2020.

Respectfully submitted,

s/ Jonathan C. Chane
Jonathan C. Chane (FBN #0125581)
Chane Socarras PLLC
11380 Prosperity Farms Road, Suite 204
Palm Beach Gardens, Florida 33410
Telephone: 561-308-9552
jchane@cslawfl.com

s/ Peter G. Friesen
Peter G. Friesen, admitted *pro hac vice*
Jeremy A. Sitcoff, admitted *pro hac vice*
LEVIN SITCOFF PC
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone: (303) 575-9390
Fax: (303) 575-9385
pgf@levinsitcoff.com
jas@levinsitcoff.com
*Attorneys for Plaintiffs*

26

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 4, 2020, the foregoing document was filed with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List via transmission of the Notice of Electronic Filing generated by CM/ECF.

By: /s/ Jonathan C. Chane_____
JONATHAN C. CHANE, ESQ.
CHANE SOCARRAS, PLLC
11380 Prosperity Farms Road, Suite 204
Palm Beach Gardens, Florida 33410