UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Civil Action No. 9:19-cv-80531-DMM

JOHN DREWES, JAMES DREWES
(as Trustee of the Drewes Family Trust),
and JAMES DREWES,

Plaintiffs,

vs.

CETERA FINANCIAL GROUP, INC. and
ADAM ANTONIADES,

Defendants.
_____/

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, John Drewes ("John"), James Drewes (as Trustee of the Drewes Family Trust) (the "Trustee") and James Drewes, in his personal capacity ("James"), by and through their undersigned counsel, hereby file their Third Amended Complaint and Jury Demand against Defendants Cetera Financial Group, Inc. ("Cetera") and Adam Antoniades ("Antoniades") and state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      John is an adult resident and citizen of the State of Indiana.

2.      The Trustee is the authorized representative of the Drewes Family Trust, which has received an irrevocable assignment of a significant portion of rights to future receipts from the Program (as defined below) and is identified as the successor beneficiary of John. The Trust was formed on April 8, 1999, in Florida and under its laws. Because all the assets of the Trust that give its trustee standing to sue are John's, the Trustee and John shall hereinafter collectively be referred to as "John."

3.      James is an adult resident of the State of Florida.

4.      Cetera is a Delaware corporation with its principal place of business in Segundo Beach, California.

5.      Upon information and belief, Antoniades is an adult resident of the State of California.

6.      The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in the State of Florida.  Cetera has its most significant contacts with the State of Florida in this district by virtue of having its Florida office in the City of Boca Raton, Florida.  Additionally, Defendants Cetera and Antoniades each committed intentional tortious acts described in this Second Amended Complaint by entering the State of Florida, either directly or through their appointed agents.

## GENERAL FACTUAL ALLEGATIONS

8.      For over twenty-five years, Legend Advisory, L.L.C. and Legend Group Holdings, L.L.C. (collectively, "Legend") conducted business by partnering with individuals in the financial industry who had assembled a significant base of clients. One of the ways Legend attracted these individuals was through its "Financial Security Program" (the "Program").

9.      The Program was marketed as a viable substitute for retirement and/or disability insurance. Legend knew that several of its competitors offered their own versions of the Program that were equal in structure and payout to the Program Legend offered, and that maintaining its

own Program was necessary to avoid losing its sales force (along with their clients) to those competitors.

10.     John was recruited in 1994 by Legend's founder to recruit and serve clients in Legend's specialized field of qualified planning and retirement planning.

11.     The arrangement between John and Legend was a contract, pursuant to which John agreed to bring his skill, expertise and client base to Legend, and agreed to solicit clients and representatives to a branch organization owned by John so that they would purchase financial products in the form of mutual funds and advisory services from Legend.  James subsequently joined John as founder of that branch organization (hereinafter, the "Branch") and Steve Fisher which they together formed to do business with Legend in Florida.

12.     Pursuant to their contract, it was Legend's responsibility to monitor, register and update the branch managers' licenses. John and James, as Legend's representatives, relied on Legend to do so.  Legend also undertook the handling of regulatory issues, of which it represented to Plaintiffs it had a special expertise.  Compliance with Legend's recitation of applicable regulations were a paramount obligation of Branch managers such as John and James, and accordingly, John and James were required to and did in fact defer to Legend's statements about regulatory matters.

13.     John and James co-owned the Branch with Steven Fisher ("Fisher"), who held a minority interest in the Branch.  The controlling share of the Branch, however, was owned by John and James.  Fisher acted as administrative supervisor and liaison to Legend and held the position of president of the legal entity that owned the Branch, and therefore owed a fiduciary duty to John and James, the other shareholders of the Branch.

14.     Though the parties agreed with Legend to refer to themselves as independent contractors, the business relationship they formed lacked the mutual autonomy ordinarily associated with the status of independent contractor.  Rather, the nature of the business relationship was so finely interconnected that it can credibly be described as a *de facto* partnership, joint venture, or a franchise relationship in which the franchisor (Legend) assumed a possessory, advisory and protective interest in the business interests of the franchisee (Branch) that marketed Legend's products and services. The substance of the relationship was such that Legend acknowledged the vulnerability imposed upon those who organized branches using the products and services of Legend—to the exclusion of others in competition with Legend—such that Legend assumed obligations of trust in the protection and promotion of those interests. Legend benefitted from this trust in the motivated labor of branch owners like John in building their businesses and understood that their business model could not function effectively without the type of reassurance that the Program represented. Thus, Legend and Plaintiffs entered into a business relationship for more than twenty years premised on the accumulating value of the business interests of branch over which branch owners ceded their dominion and control, and a concurrent obligation to account for, increase and protect that interest.

15.     While Legend did not share in the capitalization of the Branch, it treated its relationship with Branch clients as a jointly-held asset, it treated the process of selling to and advising clients as a joint enterprise, and actions made to benefit and derive profits from clients were shared assets and liabilities. If, for example, a client was improperly charged for a service or product, reimbursement to the client was a shared liability of Legend and the Branch. Cetera and Antoniades later marketed that asset as its own in the sale of its book of business (the importance

of which is explained below), inclusive of Branch managers, representatives, and clients to Lincoln.

16.     As part of that relationship Legend assumed custodial obligations that included an obligation to provide advice and protection regarding the assembled business interest held by branch owners and representatives, also referred to as a "book of business."

17.     A "book of business" is a cumulative assembly of clients held by a given representative or organization of licensed representatives, which has marketable value that can be sold and purchased for a price to other representatives or organizations of representatives. The value of a book of business depends largely on the value and number of client accounts and the control over those accounts within a business model designed to receive commissions and fees from those accounts. Its value grows for an individual representative through the development of client relationships, and also grows for an organizer of representatives through the development of employment and other contractual relationships with representatives recruited to affiliate with his or her organization.

18.     The affiliation typically involves agreements to pay a portion of fees and commissions to the owner(s) and other managers of the business entity under which the organization is formed. The value of those payments, together with the owners' individual book of business, constitute the value on which they stake their financial security. This includes providing for themselves and their family, and the accumulation of savings for disability and/or retirement.

19.     The book of business is no less important to the owner than assets reposed in an investment or savings account, or as a real estate investment.  Accordingly, the holders of a book of business are reluctant to cede control and influence over their book to others without being

assured by those to whom control is given will act under obligations of trust. In fact, a major part of the craft of developing a book of business is the formation of relationships, including incentives, obligations, and loyalties in which trustworthy behavior is ensured.

20.     Legend formally and affirmatively recognized the importance of the books of business developed by the organizers of business entities. It referred to these organizations as its "branches" and accepted and respected the business entities under which those organizations developed—whether in the form of "sole proprietorship," "partnership" or "corporation." In that sense, the book of business held by the branch was owned by the business entity under which the book of business was organized.

21.     In the case of the Drewes, their Branch was owned by Global Financial Associates ("GFA"). GFA was a corporation with a controlling interest held by John (54 percent), and non-controlling interests held by Fisher (36 percent) and James (10 percent).

22.     Legend conducted its business through the business entities that the branches represented, which included among other things, acknowledging the branches as separately owned and as parties to a business relationship with Legend; respecting a branch entity's internally selected profit distributions to its owners as management "overrides;" encouraging and honoring the development of succession plans among owners in the event of the death or disability of an owner; and accepting and honoring as obligatory the assignment of branch interests between branch stakeholders. Legend also acquired a significant measure of control over its branches that moved them from an arm's length relationship to a relationship of dependency.

23.     For example, the parties were required to operate under restrictions preventing them from doing business with each other's competitors, to submit the branch organization to  shared management oversight with Legend, to allow client revenues to be collected in a common fund

and thereafter distributed between Legend and the branch,  to jointly represent and advertise with Legend products and services, to attend conferences and training seminars together with Legend managers, and to treat clients within a book of business for a given branch as joint responsibilities.

24.     One of the primary devices by which Legend effectuated branch dependency of branch owners (and the avoidance of an arms-length relationship) was the elimination of the owners' right to the bulk-transfer of clients contained within their book of business. Typically, the owner of a book of business retained the power to move clients to another broker dealer (i.e., in competition with Legend) as a group in one transaction, thereby placing the book's owner in a strong negotiating position with a given broker dealer. The elimination of administrative rights to bulk transfer administratively converted the owner's clients into broker dealer clients because the owner was required to persuade and document their clients' change of broker dealers (at times numbering in the thousands) individually.

25.     Legend, in turn, agreed to monitor and advise on matters concerning regulatory compliance, to provide administrative support on the submission of applications necessary for licensure and registration, to maintain the quality and competitiveness of its products and services, to grow management accounts through the investment of assets brought under management by branch representatives, to train its agents as to the marketable value of its products, to operate as a referral source for business and to pay branch representatives in accordance with sharing agreements between the branch owners and its representatives.

26.     Legend also agreed to protect and grow the investment by branch owners and branch representatives in their books of business by establishing the Program (and used that term interchangeably with the terms the "Financial Security Program" and the "Retirement Program"). The Program included Legend's express acknowledgement that a book of business was vitally

important to branch owners and representatives who built that book, and that they regarded a book of business as indispensable to planning for retirement and/or disability. The Program functioned as Legend's way of acknowledging that the book of business held by a given representative or branch as a growing asset having a value that could be measured in terms of the fees and commissions it generates, and would be the subject of a guaranteed payout by Legend.

27.     Indeed, Legend encouraged its branch owners and representative to treat the Program as an effective surrogate for a retirement or disability insurance program, and most owners and representatives—including the Drewes—relied on the Program to the extent that they limited or eliminated their investment in conventional retirement plans and disability policies.

28.     While the Program was designed to begin paying out at the time an advisor chose to end his or her role as a retirement advisor, Legend emphasized repeatedly that the accumulating assets that would finance their benefits under the Program was a developing account that was growing for their benefit from the day they began working with Legend.  This was especially important in the accumulation of advisory fees and overrides, which paid out as a percentage of the assets under management.

29.     Legend would regularly include, along with information about an advisor's earnings, information about how an advisor's account was growing under the Program and what his or her account would likely grow to in the future. A management account growing at a rate of eight percent per year, for instance, was the basis for communication from Legend that their retirement account had grown and would continue to grow at that rate, in addition to new money invested by those clients.

30.     Legend repeatedly emphasized that its investment of client assets—and the resultant growth of those assets—corresponded directly and positively to the growth of its

8

advisors' retirement accounts, and that what Legend was doing in the way of investment to benefit their clients was being done to benefit them.

31.     Further, Legend used the term "vested" to describe the financial interest held by its advisors upon the funding of client accounts long before its representatives had any interest in retirement.

32.     Legend's commitment to Plaintiffs as Branch owners under the Program meant that Legend assumed a custodial role over the value of the book for Plaintiffs' benefit.  It also included assurance from Legend that Legend would avoid actions that would compromise or diminish its value and would apply investment expertise and practices designed to grow the value of the book; and would protect the book from encroachment by third parties who might wish to appropriate some or all of the book for themselves.

33.     It also included a promise to transfer active local custody of the book to another Legend representative as the payout of the Program commenced, with the new representative assuming a custodial role over their business, developing and protecting its value for the Plaintiffs, for which Plaintiffs agreed to pay a custodial fee. Legend's obligations under the Program were expensive, but cancellation of the Program presented the risk that Legend would lose its representatives and clients, or otherwise face significant liabilities.

34.     The Program was structured to pay (on a quarterly basis), among other benefits, a highly valuable management override equal to 75 percent of the advisory and custodial fees paid to active representatives. In the event a representative such as John ceased to practice at a given branch, the Program provided as follows:

**Cessation of Active Solicitation: Advisory and Custodial Fee Income**

Upon the cessation of active solicitation by representative, solicitation fee income will be continued to Representative. The fee income will be paid on any and all accounts of Representative's clients after cessation of active solicitation, at a rate equal to 75% of the rate paid to active representatives under the effective compensation schedule at the time of payment. This amount will be paid only as and if the Group earns and receives the corresponding solicitation fee. The remaining portion of the fee income normally paid to active representatives will be used to retain the business. Similarly, any fee income being received by Representative on an override basis will be paid at a rate equal to 75% of the override rate paid to active representatives receiving override fees under the effective compensation time of payment.

35.     The Program was designed to pay 20 years (to the representative or his/her heirs), or to the end of the representative's life—whichever was longer.

36.     The Program was, by design, formulated to be resilient against changes of circumstance—such as regulatory change—by formally including Legend's right and obligation to modify the Program to provide its equivalent benefits if the regulatory environment changed.

37.     In describing their relationship, Legend regularly referred to its branch agencies as "partners" and the branch owners as "family."  For over twenty years, Plaintiffs reposed confidence in Legend and Legend accepted their trust on matters essential to the business, which—when aggregated with the history of dependency described above, the adoption of a joint interest in the solicitation and financial payment of jointly served clients, representations that exalted the role of the Program in protecting the ongoing value of the books of business held by representatives and branch owners, and representations that the value of their books of business would be available in the event of disability and retirement—established a fiduciary relationship and a relationship of confidence whereby Legend committed to protect and advise the Drewes on the security of their business interests.

38.     Legend willingly solicited and accepted the trust reposed in it during this relationship and benefitted from it by receiving purchases and fees from the Drewes' clients.

39.     John's book of business, which was the lifeblood of the Branch, included his own personal clients, as well as clients of those representatives that Plaintiffs had hired and trained as employees of the Branch.  Despite that sharing his book would have otherwise exposed Plaintiffs' business to vulnerability, because of the Program, in which Plaintiffs had been induced to develop the utmost confidence and trust, John shared it with Legend.

40.     John relied on Legend's promise of financial security and worked arduously with the understanding that income flowing from his book of business would continue beyond the end of his working life and support him under the pressures of age and illness. He consciously refrained from the development of his own retirement plan and disability insurance because of Legend's representation that the Program would cover his needs.

41.     Through the Program, Legend promised that it would never transfer the value of John and James' books to another Legend representative unless they had ceased their practice and were being compensated for their books at an agreed quarterly rate. This served as the primary incentive and reassurance by which Legend representatives such as Plaintiffs agreed to fold their business interests together with Legend's.

42.     In or around 2014 or 2015, Cetera acquired control and ownership of Legend, and assumed an interest in all of Legend's business affairs, including the operation and performance of Legend's branch organizations.  Cetera was effectively doing business directly and indirectly with the Drewes because it assumed oversight of Legend's affairs, appointed Legend's chief executive officer, and treated that officer as its own agent acting on behalf of and at the behest of Cetera. Legend's CEO openly admitted to all of Legend's branches and representatives that he was

acting as Cetera's agent and at Cetera's direction. One of the business activities involved a review of all of Legend's obligations and exercising influence over those obligations, a process by which Cetera interlaced itself in the business affairs of Legend's branches. One of the things Cetera did was to stop the payment of John's overrides, which would not have happened but for changes introduced by Cetera. Then in 2016, Cetera and Antoniades developed a plan to sell Legend to Lincoln, and enlisted Lincoln Investment Capital Holdings, L.L.C. and Lincoln Investment Planning, L.L.C. (collectively, "Lincoln")[1] and Fisher to participate in a plan and conspiracy to cancel the Program to enhance the value of Legend and the Branch to Lincoln by eliminating or severely reducing the liability that the Program represented, while pocketing the gains for themselves. During that process, Cetera was engaging in direct communication with Fisher as Branch Principal and President in making preparations for the Lincoln purchase and Program cancellation, while instructing Fisher to conceal those communications from his shareholders.

43.     In 2016, Cetera negotiated the sale of Legend to Edward Forst ("Forst"). Forst is the owner and Chief Executive Officer of Lincoln and the individual with whom Antoniades negotiated the sale of Legend.  Forst later directed and participated in the plan to misappropriate Plaintiffs' interests in the Program and the Branch.

44.     As part of the purchase process, between June and August 2016, Defendants enlisted Fisher's assistance in the development of a plan for Program Cancellation.

45.     At the time Fisher was the acting President of GFA and owed a fiduciary duty to protect the Branch and its other shareholders from the misappropriation of branch assets.

---

[1] For purposes of this Third Amended Complaint, the term "Legend" is also used to identify the entities that acted prior to Legend's sale to Lincoln on January 3, 2017. "Lincoln" is used to identify the entities holding the combined assets and liabilities from the sale of Legend, as well as liability for acts committed after the sale.

46.     At Legend, Lincoln, Antoniades and Cetera's direction, Fisher agreed to withhold the disclosure of plans for Program cancellation from the Drewes, thereby preventing them from taking measures to protect their book of business and re-establishing their clientele with a broker dealer which offered the Program.

47.     In doing so, Fisher violated his duty of loyalty to the Drewes, his shareholders, and did so with the encouragement and assistance of Legend, Lincoln, Antoniades and Cetera, all of whom knew of his fiduciary duty to the branch while requiring him to refrain from notifying the Drewes about the plans for Program cancellation.

48.     During this process Cetera, acting under the direction of its President and Chief Executive Officer, Antoniades, caused Legend to cancel the Program, stating that it was "no longer supported by regulatory guidance."

49.     Antoniades made this statement on or about September 10, 2016 and had a cancellation memo drafted for the signature of Shashi Mehrotra, who was acting CEO of Legend at the time.

50.     Antoniades further ordered Mehrotra to sign and circulate the memo to the Drewes and many others throughout the country who had a vested interest in the Program.

51.     In making the statement referenced above in Paragraph No. 49, Defendants intended to discourage opposition and dissent among managers suffering loss, intending to discourage them from moving their books of business to competitors and induce them to eventually release their claims against Legend.

52.     Prior to that date, on or about June 13, 2016, in a meeting held in Orlando, Florida with selected Lincoln and Cetera executives, and with Fisher present, Antoniades stated that Legend was under no legal obligation to continue the Program due to regulatory considerations.

53.     At the time of both of those representations, Antoniades was acting as President of Cetera and made the statements as part of the process of selling Legend to Lincoln at a better price, by reducing the stated liabilities of Legend for payments due under the Program.

54.     In actuality, there was no regulation or change of regulation that justified cancellation of the Program, and Cetera and Antoniades knew that there was no reasonable basis for the cancellation of the Program.

55.     Antoniades knew, in fact, that regulatory changes, if any, were the requisite basis on which to modify—not cancel the Program—so that the equivalent of its benefits could be provided.

56.     In the purchase agreement between Cetera and Lincoln for the purchase and sale of Legend, the parties expressly set forth not only how the gains and liabilities of the Program cancellation would be shared, but also the process by which first Cetera and Antoniades, and later Lincoln, would take measures to prevent branch owners, including John and James, from moving their books of business to competitors of Legend who offered similar programs.

57.     Defendants were thus able to take the collective value for the Program for themselves and, in a manner subsequently discovered, retained, apportioned, or shared Legend's liabilities, including those associated with cancelling the Program, with Lincoln.

58.     John and James' rights to receive the benefits under the Program, however, were vested rights guaranteed by contract with Legend.  Legend had no authority to unilaterally cancel the Program without providing its equivalent value to them.

59.     As part of his interest in and use of the Program, John had a formal plan and intention to assign to James his interests in his book of business, including accounts that would be

generating overrides and benefits under the Program, and that his stock interest in the Branch would likewise assign to James who would be majority shareholder and Principal.

60.     This plan of succession had been communicated to and accepted by Legend, and the right of John to assign his book to his son was an express and implied right of John under the terms of his contract with Legend. This right was verified in written statements, and in practices accruing over a period of twenty years, and in Legend's various and repeatedly communicated promotion of Legend benefits and the Program. Legend solicited and received this plan of succession, made no requests for its modification or clarification, and allowed John and James to proceed with their business affairs on the premise that the plan of succession would be honored.

61.     Upon learning that the Program was to be cancelled, John's attempts to transfer his business to James was thwarted by Fisher and Forst.  A major objective of their plan was to transfer John's book of business to Lincoln and Fisher without having to compensate John and James. That objective was ultimately achieved after Lincoln acquired Legend in July of 2018, when Lincoln closed the Branch, moved John's book of business to a new Branch established by Fisher, and terminated the Drewes' registration.  In the year leading up to that transfer, Lincoln and Fisher depleted the value of the Drewes' interest in the Branch by cancelling John's overrides and other fees (which had been promised and assigned to James) and taking those fees for themselves.

62.     The reason given for stopping the payment of his overrides directly was Legend's failure more than 10 years earlier to have filed the necessary registration documents. It was Legend's obligation to do so, though Legend continued to pay John his overrides because it did not believe that a Series 65 license was necessary for the payment of those overrides to John.

63.     Notwithstanding its own mistake, Legend then used the lack of registration of John's Series 65 license as a reason for non-payment of John's overrides, even though John had

retained his Series 6 license, which was sufficient for him to receive overrides under the existing regulations.

64.     Cetera and Antoniades perpetrated this injustice by falsely representing to Legend personnel that John's Series 6 license, without a Series 65 license, was insufficient to continue payment of his overrides. Antoniades made that representation to Legend personnel with the intent and expectation that it would be communicated to John and induce him to acquiesce to the non-payment or take non-payment as a prompt to move his business elsewhere.

65.     On September 2, 2016, while studying for the Series 65 exam so that he could restore the  license  Legend had allowed it to lapse, John suffered a major stroke and was rendered incapable of performing difficult cognitive tasks, including effectively negotiating or opposing contractual terms with Legend, or moving his business to another broker dealer. He was also 77 years old.

66.     By the time of his stroke, the Branch had over 30 representatives. John's compensation from Legend was based on the assets under management ("AUM"), which were valued at roughly $250 million, and which were growing at a rate of about $30 million per year. The anticipated expansion of AUM was expected to rise by 300 percent or more within ten years.

67.     As such, Plaintiffs' business was an attractive target of acquisition to competitors, and to Defendants.

68.     Seizing on John's debilitated state, Defendants demanded that he sign an agreement to release his rights to the Program—at that point worth over $15 million to him—in exchange for a $25,000 payment and "other valuable consideration."  The $25,000 payment was for overrides that were already owed to him but had not yet been paid.

69.     The release was presented to him by Fisher, who was at the time acting in concert with Cetera and Antoniades.  The "other valuable consideration" referred to arrangements that John had been making to assign his right to receive overrides to his son James, and to replace Fisher with James as the principal of the Branch, meaning, that he would serve as the general manager of the Branch and primary liaison between the Branch and Lincoln James had all the licenses and qualifications necessary to act as principal and manager of the Branch and was ready willing and able to assume that position.

70.     The release agreement was drafted by Defendants and submitted to John on a "take it or leave it" basis, and no changes were permitted to be made to it by him.

71.     Because of the fiduciary duty owed by Legend however, Defendants were obligated to be fair and reasonable with John because it acted through Legend. The exchange of a business interest worth well in excess of $15,000,000 for a $25,000 payment cannot, by any objective standard, be deemed fair and reasonable in this case.

72.     That release agreement was, moreover, procured through the fraudulent representation by Defendants that the Program was terminated due to *bona-fide* and legitimate regulatory changes, and through the false and fraudulent promise to assign John's rights of payment to his son James, and to place James in the position of principal and controller of the Branch.

73.     Cetera and Antoniades had also influenced Legend and Fisher to reduce the distributions John was entitled to receive through his corporate ownership of the Branch, and communicated to John through Legend and Fisher that if he did not release his interests in the Program, he would never be paid again in any form, and would, in effect be left without the means of supporting himself while struggling with a major disability.

17

74.     These actions not only caused John to release his interest in the Program but set in motion a series of events that enabled the subsequent theft of Plaintiffs' business.

75.     John's release coupled with Program cancellation under the broad and false announcement that it, or the supply of its equivalent, were in violation of regulatory authority had an enabling impact on Lincoln and Fisher's misappropriation of the Drewes' business. The theft of their business was premised on the supposition that John had retained no contractually viable interest in his business at all.

76.     Defendants essentially communicated to Lincoln that it owned the Drewes' business, and could thus transfer the Drewes' trade secrets, employees and client lists to Lincoln without any legal encumbrance or liability. They knew there was little that John could do about it, because he had become disabled and refused to acknowledge James' rights as John's successor.  It was part of a scheme to sell the Drewes' business to Lincoln, without paying them.

77.     Lincoln, Fisher and Forst acted in collusion with Defendants to effectuate this scheme. Defendants obtained the Drewes' acquiescence to the transfer of the business by making promises it never meant to keep.

78.     At the time Legend promised to assign John's overrides to James and to replace him as principal and controller of the Branch, Defendants had no intention to allow Legend to honor the promise. Neither Legend nor Lincoln made the promised transfer of control, and 15 months later, in February 2018, Lincoln cancelled payments to James claiming that it had "no contractual basis" for such payments, and that Fisher—who held a minority interest in the Branch—could stop the payment of overrides even though it violated the legitimate interests of his majority shareholders.

79.     By July 2018, Lincoln had formed another branch with Fisher in competition with the Branch and directed Fisher to take all the representatives and their clients to the newly formed branch.

80.     In addition to the fraudulent procurement of the release, since the promise of assignment to James and his placement in the role of principal of the Branch was the "other consideration" contemplated by the release, Lincoln's failure to abide by that promise renders it unenforceable against John. Legend was obligated at Plaintiffs' request to assign John's overrides to James, restore James' control over the Branch and properly inform Lincoln of that obligation.

### COUNT I:  INTENTIONAL INTERFERENCE WITH CONTRACT
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

81.     Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

82.     There was a contract between John, James and Legend. Defendants Cetera and Antoniades knew of this agreement but claim they were not parties to it.

83.     The business relationship involved a contractual agreement between Legend and Plaintiffs to provide John and James benefits under the Program, to restore control of the Branch to Plaintiffs, and to assign commissions and overrides from John to James.

84.     Defendants Cetera and Antoniades knew of these contractual expectations and took action to interfere with, defeat or disrupt those expectations. These acts were committed by agents acting on behalf of Cetera, and by Antoniades, which included influencing the CEO of Legend to cancel the Program, resulting in the denial of program benefits to John at the time he was incapacitated, and to James at the time Lincoln terminated his representative agreement. Cetera and Antoniades also willfully failed to effectively communicate to Lincoln that Branch control

was promised to James, and willfully failed to effectively communicate that James had a contractual right to receive an assignment of John commissions and overrides.

85.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

86.     The conduct described above was wanton, malicious, and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

**COUNT II:**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

87.     Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

88.     In the alternative, Plaintiffs allege that Cetera intentionally interfered with the advantageous business relationship that existed between Plaintiffs and Legend.

89.     Plaintiffs and Legend had an advantageous business relationship central to the operation and profitability of the Branch.  Plaintiffs had legal rights pursuant to that business relationship, not the least of which included the rights to override commissions and benefits from the Program.

90.     Defendants Cetera and Antoniades knew of the business relationship between Legend and Plaintiffs and intentionally interfered with and disrupted it by influencing Legend to cancel John's overrides; cancel John and James' Program benefits; withhold control of the Branch from John and James while instilling that control in Fisher; and by affirmatively stating to Lincoln during and after negotiations its purchase of hat Legend had no obligations to restore control of the Branch to Plaintiffs or to assign John's rights of compensation to James.

91.     Defendants Cetera and Antoniades' actions were unjustified in that they were made with an intent to disrupt longstanding obligations of trust between Plaintiffs, Fisher and Legend, with the intent of avoiding liabilities associated with the Program's cancellation, and with the specific intention of depriving Plaintiffs of the value of business interests, business relationships and a retirement and disability Program that had accumulated for over twenty years.

92.     As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

93.     The conduct described above was wanton, malicious, and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

## COUNT III:  CONSTRUCTIVE FRAUD (BREACH OF FIDUCIARY DUTY)
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

94.     Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

95.     Legend's business relationship with Plaintiffs was one based on confidence and trust established through Legend's assumption of the role of joint possessor, protector, advisor and custodian of the value of Plaintiffs' book of business under the Program. Legend solicited, benefitted from and accepted a protective and advisory role as to the assets that Plaintiffs' book represented.  John also reposed confidence in Fisher, as acting principal and President of the Branch of which Plaintiffs held a majority interest, and Fisher accepted John's trust.  Accordingly, Legend and Fisher stood in a confidential relationship with Plaintiffs. Defendants Cetera and Antoniades knew of this relationship.

96.     Legend breached its fiduciary duty to John by failing to exercise diligence over the maintenance of John's license, failing to properly ensure compliance with regulatory standards on which John and James' financial security depended, failing to pay overrides to John in 2016,

ordering the pretextual cancellation of the Program, fraudulently and coercively procuring release agreements from John, failing to restore control of the Branch to Plaintiffs, and failing to properly notify Lincoln of Legend's then-existing obligations to Plaintiffs. Fisher breached his fiduciary duty by participating in and helping plan the cancellation of the Program without disclosing his divided loyalty, assisting in Legend's coercive efforts to obtain a release from John, and resisting and refusing John's request to restore control of Branch management to James.

97.    Among these acts, Cetera and Antoniades were directly involved in the cancellation of the Program, the use of fraudulent statements to procure John's release and acquiescence to the cancellation and the enlistment of Fisher to violate his duty of loyalty to the Drewes.  These acts committed through Legend at the express direction of Antoniades, acting on his own and on Cetera's behalf.  Legend and Fisher acted as the agents of Cetera, and under control, authorization, and order of Antoniades. Indeed, Cetera exercised complete control over Legend's executive officers in the year preceding Program cancellation.

98.    As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

99.    The conduct described above was wanton, malicious, and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

### COUNT IV:  CONSPIRACY TO COMMITT CONSTRUCTIVE FRAUD
### (BREACH OF FIDUCIARY DUTY)
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

100.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

101.    Legend's business relationship with Plaintiffs was one based on confidence and trust established through Legend's assumption of the role of joint possessor, protector, advisor,

and custodian of the value of Plaintiffs' book of business under the Program. Legend solicited, benefitted from, and accepted a protective and advisory role as to the assets that their book represented.  John also reposed confidence in Fisher, as acting principal and President of the Branch of which Plaintiffs held a majority interest, and Fisher accepted John's trust.  Accordingly, Legend and Fisher stood in a confidential relationship with Plaintiffs. Defendants Cetera and Antoniades knew of this relationship.

102.    Antoniades, acting on behalf of Cetera, actively directed some of the constructively fraudulent acts. The acts that pertain to the withholding of overrides, the cancellation of the Program, Fisher's secret engagement and assistance in the planning process for Program cancellation, and fraudulent and coercive procurement of releases were performed at his direction.

103.    Cetera and Antoniades were the organizers of and/or participants in a conspiracy to constructively defraud Plaintiffs by taking the value of their business interests from them and transferring them to Legend, Lincoln, and Fisher. There was an express agreement among Cetera, Antoniades, Lincoln and Fisher to share the benefits appropriated from Plaintiffs' business, as well as the liabilities associated with the taking of that business.

104.    Pursuant an agreement to misappropriate the Drewes' business interest that preceded Lincoln's acquisition of Legend, , Lincoln and Fisher proceeded  to denounce and avoid all obligations to Plaintiffs while taking what they had assembled for their financial security by committing acts such as the cancellation of assignment payments to James, and the subsequent taking of Plaintiffs' business by opening a competing branch, transferring all of Plaintiffs' representatives to it, and cancelling Plaintiffs' contract with Lincoln.  These overt acts were consistent with and pursuant to the conspiracy that originated with Antoniades, Cetera, Legend, Fisher and Lincoln before Lincoln purchased Legend.

105.    As the originating co-conspirators, Antoniades and Cetera are liable for their own acts, as well as the acts of Lincoln and Fisher who continued to carry out the strategic plan formulated before the Legend purchase. These acts were part of a larger plan to divest Plaintiffs of a position of control where they might take their business to competitors offering benefits similar to the Program, to avoid liabilities for Program cancellation, and to ultimately separate Plaintiffs from their business in its entirety.

106.    The subsequent acts involving the theft of Plaintiffs' business were a foreseeable consequence of the acts taken that resulted in the loss of John's license, the termination of his override payments, the cancellation of the Program, the fraudulent and coercive procurement of his release, and the misrepresentation of obligations to him and James.

107.    As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

108.    The conduct described above was wanton, malicious, and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

## COUNT V:  AIDING AND ABETTING CONSTRUCTIVE FRAUD
### (BREACH OF FIDUCIARY DUTY)
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

109.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

110.    Legend's business relationship with Plaintiffs was one based on confidence and trust established through Legend's assumption of the role of joint possessor, protector, advisor, and custodian of the value of Plaintiffs' book of business under the Program. Legend solicited, benefitted from, and accepted a protective and advisory role as to the assets that their book represented.  John also reposed confidence in Fisher, as acting principal and President of the

Branch of which Plaintiffs held a majority interest, and Fisher accepted John's trust. Accordingly, Legend and Fisher stood in a confidential relationship with Plaintiffs. Defendants Cetera and Antoniades knew of this relationship.

111. Cetera and Antoniades aided and abetted Legend, Lincoln and Fisher in committing constructive fraud against Plaintiffs by ordering the Program's cancellation under false pretenses, enlisting Fisher in the planning of that cancellation, inciting and encouraging Fisher to violate his duty of loyalty to the Drewes and procure releases from Plaintiffs through misrepresentation and coercion, making misrepresentations to Lincoln regarding the obligations of Legend to Plaintiffs, and failing to restore control of the Branch to Plaintiffs before Legend was purchased by Lincoln, which ultimately allowed for the theft of Plaintiffs' business—which could not have happened but for that assistance.

112. As a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

113. The conduct described above was wanton, malicious, and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

**COUNT VI:**
**EXPLOITATION OF AN ELDERLY ADULT OR DISABLED PERSON**
**INVIOLATION FLORIDA STATUTE 825.103**
**BY PLAINTIFFS JOHN AND THE TRUSTEE AGAINST ALL DEFENDANTS**

114. Plaintiffs John and the Trustee restate the allegations of paragraph 1 through 80 as if fully set forth herein.

115. Under Florida Statute section 772.11, any person who proves by clear and convincing evidence that he has been injured in any fashion by reason of any violation of section 825.103(1) has a cause of action for threefold the actual damages sustained. Fla. Stat. § 772.11(1) (2019).

116.     Plaintiffs have submitted a demand pursuant to Florida Statute Section 772.11. That demand was rejected.

117.     Since September 2, 2016, John has been an elderly person and incapacitated by stroke within the meaning of Florida Statute 825.103. Legend's knowledge of John's incapacity is imputed to Cetera because Fisher and Legend's chief operating officer, Sashi Mehrotra ("Mehrotra"), knew of John's condition and were acting as managing agents of Cetera, as Legend's alter ego, and under the direction of Antoniades.

118.     Defendants violated Florida Statute 825.103 because they had a business relationship with John and his Branch, by which they controlled and directed Legend in its business affairs with John, and in the course of that relationship, knowingly obtained and took his assets and property with the intent to deprive him of the use, benefit, or possession them.  They also violated the Statute because John reposed confidence and trust in Legend, Mehrotra and Fisher, Defendants knew of this relationship of trust and directed Legend, Mehrotra and Fisher to take acts resulting in John's release of his interest in the Program for grossly inadequate consideration.

119.     Defendants further violated the Statute by cancelling John's rights under the Program without cause, committing fraud in obtaining John's rights of control over his assets, and imposing upon him a release agreement through fraud and duress.

120.     As a direct and proximate consequence of these acts, Plaintiffs John and the Trustee have and continue to suffer damages and are entitled to an award of three times the damages they have suffered pursuant to Section 772.11 of the Florida Statutes.

**COUNT VII:**
**CONSPIRACY TO EXPLOIT ELDERLY ADULT OR DISABLED PERSON**
**IN VIOLATION OF FLORIDA STATUTE 825.103**
**BY PLAINTIFFS JOHN AND THE TRUSTEE AGAINST ALL DEFENDANTS**

121.     Plaintiffs John and the Trustee restate the allegations of paragraph 1 through 80 as if fully set forth herein.

122.     Defendants Cetera and Antoniades, along with co-conspirators Legend and Fisher, knew that John was both elderly and disabled, and lacked the capacity to consent to the release of his interests and the loss of his business.

123.     Under Florida Statute section 772.11, any person who proves by clear and convincing evidence that he has been injured in any fashion by reason of any violation of section 825.103(1) has a cause of action for threefold the actual damages sustained.  Fla. Stat. § 772.11(1) (2019).

124.     Plaintiffs have submitted a demand pursuant to Florida Statute Section 772.11. That demand was rejected.

125.     Since September 2, 2016, John has been an elderly person and incapacitated by stroke within the meaning of Florida Statute 825.103. Legend's knowledge of John's incapacity is imputed to Cetera because Fisher and Legend's chief operating officer, Sashi Mehrotra ("Mehrotra"), knew of John's condition and were acting in conspiracy with Legend, Lincoln and Fisher in the formulation and execution of a plan to misappropriate Plaintiffs' business interests, which because of John's age and disability, included the violation of Florida Statute 825.103.

126.     Defendants violated Florida Statute 825.103 because their co-conspirators Legend and Fisher had a business relationship with John and his Branch that involved the acquisition and servicing of clients for the Branch, and knowingly obtained and took his assets and property with the intent to deprive him of the use, benefit, or possession them. They also violated the Statute

because he John reposed confidence and trust in Legend, Mehrotra and Fisher, Defendants knew of this relationship of trust and directed Legend, Mehrotra and Fisher to take acts resulting in John's release of his interest in the Program for grossly inadequate consideration.

127.    The overt acts committed in furtherance of the conspiracy include Defendants participation in the formulation of a plan designed to take business interests of John and James, while offering a small fraction of the value of the taking in return, the secretive enlistment of Fisher in violation of his obligation of loyalty to the Drewes in the planning of that taking, the execution of an express agreement by which the benefits and liabilities associated with the taking would be shared between Legend and Lincoln, and the specific acts of Program cancellation and release procurement through fraudulent disclosures and without adequate compensation, as well as later acts designed to escape with the taking by defaulting on promises to assign payments to and vest control in James.

128.    Moreover, acts committed before Defendants' sale to Forst and Lincoln enabled and assisted Forst, Lincoln and Fisher in their misappropriation of Plaintiffs' business interests by cancelling the program before Lincoln's purchase of Legend closed, procuring a release from John, and communicating to Lincoln that there was no obligation owed to John or James by Legend. The later acts that completed the taking of Plaintiffs' business would not have occurred but for acts and organizational input given by Defendants Cetera and Antoniades.

129.    As a direct and proximate consequence of these acts, Plaintiffs John and the Trustee have and continue to suffer damages and are entitled to an award of three times the damages they have suffered pursuant to Section 772.11 of the Florida Statutes.

## COUNT VIII:  FRAUDULENT MISREPRESENTATION
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

130.     Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

131.     Defendants Cetera and Antoniades (acting as managing agent for Cetera) made false statements of material fact to Plaintiffs regarding the Program.

132.     Specifically, Defendants misrepresented (1) that John was ineligible to receive overrides because he did not have a Series 65 license, a statement made or about February 1, 2016 by an agent of Cetera, which was at that time exercising regulatory oversight of the Drewes' business, (2) that Legend had "no obligation" to provide Program benefits or their equivalent to John (and many others) due to regulatory prohibitions against it, a statement made on or about June 13, 2016 by Antoniades acting on behalf of Cetera as its President, and (3) that regulatory considerations required that the Program be cancelled, stating, "The Legend Group ("Legend") created the Legend Advisor Financial Security Program (the "Program") with the goal of assisting representatives through retirement.  However, having recently completed a review of the Program, we have determined that it is no longer supported by regulatory guidance." This statement was made on or about September 10, 2016 and communicated to all Legend representatives by Mehrotra at Antoniades' direction in a written notification to Legend advisors.

133.     All of the foregoing statements were false.

134.     Cetera and Antoniades knew or should have known at the time they made these statements to Plaintiffs that the statements were false.

135.     Defendants made the statements to Plaintiffs with the intent to induce John to accept cancellation of the Program as a regulatory matter (to which Legend had assumed responsibility and authority in the past). Antoniades hoped and expected that due to the longstanding dependency

of Legend representatives on the regulatory expertise of Legend, these representatives would reassign their commission rights back to Legend, and sign releases of liability to Legend and its affiliated entities in exchange for a severely discounted buyout.

136.   Having been told that the Program was cancelled for regulatory reasons, John sought reassurance that he could make a binding assignment of his commissions and overrides to his son James, and moreover to protect that assignment, that control of the Branch as principal would be transferred to James as well. On those conditions John—who was incapacitated by a stroke—signed a release agreement submitted to him by Mehrotra and Fisher. Mehrotra promised to assign John's compensation to James and to install James as principal of the Branch. He made these promises with no intention of binding Legend or its successors, and apparently later told Lincoln that no such promises were made.

137.   Antoniades' statements materially induced John to take the path of least resistance. With respect to the first fraudulent statement Antoniades made, John arranged to have overrides delivered to Fisher, who later failed to pay them to John. These arrangements were premised on the assumed good faith of statements originally made by Antoniades and were passed along to John. With respect to the second and third fraudulent statements made, John again accepted that they were made honestly and in good faith and again sought to accommodate the concerns by transferring his compensation to James and agreeing to sign a release of liability to Legend. But for Antoniades' statements, John would not have signed the release. Also, but for the promises made by Mehrotra, acting on Cetera's behalf, he would not have signed the release. The release has been and is still used by Lincoln as a significant basis for the denial of any obligations to John and James.

138.    In reliance on Defendants' false statements, Plaintiffs have and continue to suffer damages.

139.    The conduct described above was wanton, malicious and fraudulent, and Plaintiffs reserve the right to seek an award of punitive damages at a later date.

### COUNT IX:  NEGLIGENT MISREPRESENTATION
### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

140.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

141.    Defendants Cetera and Antoniades (acting as managing agent for Cetera) made false statements of material fact to Plaintiffs regarding the Program.

142.    Specifically, Defendants misrepresented (1) that John was ineligible to receive overrides because he did not have a Series 65 license, a statement made on or about February 1, 2016 by an agent of Cetera, which was at that time exercising regulatory oversight of the Drewes' business, (2) that Legend had "no obligation" to provide Program benefits or their equivalent to John (and many others) due to regulatory prohibitions against it, a statement made on or about June 13, 2016 by Antoniades acting on behalf of Cetera as its President, and (3) that regulatory considerations required that the Program be cancelled, stating, "The Legend Group ("Legend") created the Legend Advisor Financial Security Program (the "Program") with the goal of assisting representatives through retirement. However, having recently completed a review of the Program, we have determined that it is no longer supported by regulatory guidance." This statement was made on or about September 10, 2016 and communicated to all Legend representatives by Mehrotra at Antoniades' direction in a written notification to Legend advisors.

143.    All of the foregoing statements were false.

144.    Cetera and Antoniades knew or should have known at the time they made these statements to Plaintiffs that the statements were false.

145.    Defendants made the statements to Plaintiffs with the intent to induce Plaintiffs to act on them, and indeed, Plaintiffs did so.

146.    Plaintiffs justifiably relied on Defendants' false statements, and as a result have and continue to suffer damages.

**COUNT X:  BREACH OF CONTRACT**
**BY ALL PLAINTIFFS AGAINST DEFENDANT CETERA**

147.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

148.    A valid contract exists between John and James, on one hand, and Legend, on the other.

149.    The contract required Legend to perform the following obligations: (1) the diligent provision of administrative services needed in submitting licensing registration and renewal applications for John; (2) the competent and diligent review of regulations necessary to effectuate the Program for John and James, or its equivalent; (3) timely notification to John and James of regulatory concerns about the Program; (4) the establishment of control over the Branch in John and James as majority shareholders in accordance with an approve succession plan and in accord with promises made prior to John's execution of a release; (5) the payment of override compensation to John directly; and (6) the maintenance and extension of the Program to John and James.

150.    Each of these obligations was a material term of the contract between Legend and Plaintiffs.

151.    Plaintiffs gave as consideration for these obligations valuable client contacts, information networks, years of branch management, recruiting and training of representatives, and substantial advisory services.

152.    Plaintiffs satisfied all their obligations under the contract.

153.    Legend breached the contract by failing to properly register John for his Series 65 license, failing to competently and diligently review regulations necessary to effectuate the Program, failing to notify them of concerns about the Program, failing to establish control over the Branch in John and James as majority shareholders, failing to pay John override compensation, and by failing to extend the Program to John when he was disabled by a stroke and failing to extend the Program to James.

154.    Cetera assumed the contractual obligations of Legend when it assumed ownership and control of Legend and installed Legend's CEO as its agent, there to act upon the instruction and at the behest of Cetera, to the exclusion of all others.

155.    As a direct and proximate result of breach of contract, John was prevented from receiving promised compensation for commissions and overrides, and John and James lost their ability and right to negotiate with Legend competitors for benefits they had been denied, and ultimately lost their business to Fisher. Accordingly, as a direct and proximate consequence of these acts, Plaintiffs have and continue to suffer damages.

## COUNT XI:  PROMISSORY ESTOPPEL
### BY ALL PLAINTIFFS AGAINST DEFENDANT CETERA

156.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

157.    Legend affirmatively represented to John and James for more than ten years that Legend would provide them benefits under the Program.

33

158.    John and James actually relied on these promises to their detriment, by working arduously for many years in an attempt to develop benefits offered, avoiding business relationships with other broker dealers, refraining from the pursuit of other retirement and disability options available to them, and relaxing control over their books of business.

159.    Legend has failed to provide these benefits, or their equivalent, to John and James as promised, which failure has caused them actual harm.

160.    Cetera assumed the promises of Legend when it assumed ownership and control of Legend and installed Legend's CEO as its agent, there to act upon the instruction and at the behest of Cetera, to the exclusion of all others.

161.    Enforcement through Cetera of Legend's promises to John and James is required to prevent further injury and avoid injustice to Plaintiffs.

### COUNT XII:
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### BY ALL PLAINTIFFS AGAINST DEFENDANT CETERA

162.    Plaintiffs restate the allegations of paragraph 1 through 80 as if fully set forth herein.

163.    In every contract there is an implied covenant of good faith and fair dealing requiring that each party to a contract deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party or parties to receive the benefits of the contract.

164.    Plaintiffs and Cetera (through Cetera's assumption of Legend's duties and obligations) were parties to a contract in the form of the Program. Cetera assumed the contractual obligations of Legend when it assumed ownership and control of Legend and installed Legend's CEO as its agent, there to act upon the instruction and at the behest of Cetera, to the exclusion of all others.

34

165.   Plaintiffs substantially performed their obligations under the contract.

166.   Cetera unfairly interfered with Plaintiffs' rights to receive the benefits of the contract by, among other things:

    a.   committing the aforementioned acts of constructive fraud;

    b.   by failing to give due consideration of John and James' rights of control over their business;

    c.   cancelling important benefits under the Program without reasonable justification,

    d.   giving unsupportable justifications for the denial of payments and benefits under their contract;

    e.   securing a release from John under false pretenses;

    f.   failing to honestly convey their accrued obligations to Lincoln; and

    g.   placing Plaintiffs in a position where Fisher and others could steal their book of business.

167.   In doing so, Cetera breached implied covenant of good faith and fair dealing.  As a direct and proximate consequence of Cetera's actions, Plaintiffs have and continue to suffer damages.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants Cetera Financial Group, Inc. and Adam Antoniades, jointly and severally, and award compensatory economic and non-economic and consequential damages; punitive damages, as allowed; treble damages as allowed under law for abuse of the elderly and disabled; pre-judgment and post-judgment interest; attorneys' fees and costs of this action, including expert witness fees, as appropriate; and any other such relief this Court deems necessary and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues so triable.


DATED this 10th day of August 2020.

Respectfully submitted,

*s/ Jonathan C. Chane*
Jonathan C. Chane (FBN #0125581)
Chane Socarras PLLC
11380 Prosperity Farms Road, Suite 204
Palm Beach Gardens, Florida 33410
Telephone: 561-308-9552
jchane@cslawfl.com

*s/ Peter G. Friesen*
Peter G. Friesen, admitted *pro hac vice*
Jeremy A. Sitcoff, admitted *pro hac vice*
LEVIN SITCOFF PC
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone: (303) 575-9390
Fax: (303) 575-9385
pgf@levinsitcoff.com
jas@levinsitcoff.com
*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 10, 2020, the foregoing document was filed with the

Clerk of the Court using the CM/ECF system.  I also certify that the foregoing document is being

served this day on all counsel of record identified on the Service List via transmission of the Notice

of Electronic Filing generated by CM/ECF. Service List includes **Alex J. Sabo, Esq.**, and **Karl L.**

**Marquardt, Esq.**, BRESSLER, AMERY & ROSS, P.C.*,* 200 S. Biscayne Blvd., Suite 2401,

Miami, Florida 33131; asabo@bressler.com; kmarquardt@bressler.com.


By: /s/ Jonathan C. Chane_____
      JONATHAN C. CHANE, ESQ.
      CHANE SOCARRAS, PLLC
      11380 Prosperity Farms Road, Suite 204
      Palm Beach Gardens, Florida 33410