UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-80531-Matthewman

JOHN DREWES, JAMES DREWES
(as Trustees of the Drewes Family Trust)
and JAMES DREWES,

               Plaintiffs,

v.

CETERA FINANCIAL GROUP, INC.,
and ADAM ANTONIADES,

               Defendants.

_____/

FILED BY _____ KJZ _____ D.C.

Dec 7, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

**OMNIBUS ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND/OR MOTION TO STRIKE CERTAIN AFFIRMATIVE DEFENSES [DE 139]; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DE 142]; DEFENDANTS' MOTION TO DISREGARD THE DECLARATION OF MARK SPINELLO [DE 181]; AND PLAINTIFFS' SUGGESTION OF DEATH AND MOTION TO SUBSTITUTE PARTY [DE 200]**

THIS CAUSE is before the Court upon Plaintiffs, John Drewes, James Drewes (as Trustee of the Drewes Family Trust), and James Drewes' (collectively "Plaintiffs") Motion for Partial Summary Judgment and/or Motion To Strike Defendants' First, Second, Fifth, Eighth and Ninth Defenses in Defendants' Answer and Defenses to Third Amended Complaint [DE 139], and Defendants, Cetera Financial Group, Inc. ("Cetera") and Adam Antoniades' (collectively, "Defendants") Motion for Summary Judgment [DE 142]. The parties have filed Statements of Material Fact and evidence to support their motions and have responded, replied, and sur-replied to each motion for summary judgment. *See* DEs 140, 141, 166, 165, 177, 178, 197, 143, 144, 164, 163, 179, 180, 198.

This cause is also before the Court upon Defendants' Motion to Disregard the declaration of Mark Spinello [DE 181].  Plaintiff filed a response in opposition [DE 186], and Defendant replied [DE 196].

Lastly, this cause is also before the Court upon Plaintiffs' Suggestion of Death and Motion to Substitute Party [DE 200]. Defendants filed a response [DE 209], and Plaintiffs replied [DE 209].

The Court held a hearing on the motions via Zoom video teleconference on November 17, 2021. The matters are now ripe for review, and the Court has carefully considered the filings and attachments thereto and the arguments of the attorneys at the hearing, as well as the entire docket in this case.

## I.   <u>SUMMARY OF THE CASE</u>

This case involves a continuing compensation program and the circumstances by which the program was ultimately cancelled. To provide context, the Court finds it necessary to provide a summary of the basic facts in the complaint.

### A.  Summary of the Complaint

For over twenty-five years, Legend Advisory, L.L.C. and Legend Group Holdings, L.L.C. (collectively, "Legend") conducted business by partnering with individuals in the financial services industry who had assembled a significant base of clients. One of the ways Legend attracted these individuals was through its "Financial Security Program" (the "Program").[1] [DE 73 ¶ 8].

---

[1] For the purposes of summarizing the complaint, the Court will refer to the initial Financial Security Program and the operative program, the Legend Advisor Financial Security Program-LEGACY Version, as the "Program." The distinction between the initial Financial Security Program and the Legend Advisor Financial Security Program-LEGACY Version will be discussed in detail in the undisputed facts, *infra*.

The Program allowed registered representatives to receive a 75% override on the advisory and custodial fee income generated by their books of business after retirement from the financial services industry. *Id.* ¶¶ 33-34, 41. Legend incentivized financial advisors to grow their books of business by offering the Program. *Id.* ¶ 34.

The arrangement between John Drewes and Legend was a contract, pursuant to which John agreed to bring his skill, expertise and client base to Legend, and agreed to solicit clients and representatives to a branch organization owned by John so that they would purchase financial products in the form of mutual funds and advisory services from Legend. James Drewes, John's son, also joined John as founder of that branch organization (hereinafter, the "Branch"). *Id.* ¶ 9. John and James co-owned the Branch with Steven Fisher, who held a minority interest in the Branch. Fisher acted as administrative supervisor and liaison to Legend and held the position of president of the legal entity that owned the Branch, Global Financial Associates ("GFA"). *Id.* ¶ 13. John and James owned the controlling share of GFA. *Id.* ¶ 21.

Over time, Plaintiffs developed their book of business, which "has a marketable value that can be sold or purchased for a price to other representatives or organization of representatives." *Id.* ¶ 17. John also grew the Branch by recruiting other financial advisors to join the Branch, who would then develop their own books of business. *Id.* ¶¶ 11, 17.

Pursuant to their contract, it was Legend's responsibility to monitor and advise on matters concerning regulatory compliance, to provide administrative support on the submission of applications necessary for licensure and registration, to maintain the quality and competitiveness

---

With this one exception, all other defined terms in this section are consistent with the Statement Of Material Facts As To Which There Is No Genuine Issue, Section V.

of its products and services, to grow management accounts through the investment of assets brought under management by branch representatives, to train its agents as to the marketable value of its products, to operate as a referral source for business, and to pay branch representatives in accordance with sharing agreements between the branch owners and its representatives. *Id.* ¶ 12, 25. Through the Program, Legend promised that it would never transfer the value of Plaintiffs' books to another Legend representative unless they had ceased their practice and were being compensated for their books at an agreed quarterly rate. This served as the primary incentive and reassurance by which Legend representatives such as Plaintiffs agreed to fold their business interests together with Legend's. *Id.* ¶ 41.

While the Program was designed to begin paying out at the time an advisor chose to end his or her role as a retirement advisor, Legend emphasized repeatedly that the accumulating assets that would finance their benefits under the Program was a developing account that was growing for their benefit from the day they began working with Legend. *Id.* ¶ 28. This was especially important in the accumulation of advisory fees and overrides, which paid out as a percentage of the assets under management. *Id.* ¶ 28.

Plaintiffs treated the Program as an effective surrogate for a retirement or disability insurance program and relied on the Program to the extent that they limited or eliminated their investment in conventional retirement plans and disability policies. *Id.* ¶ 27. John refrained from the development of his own retirement plan and disability insurance because of Legend's representation that the Program would cover his needs. *Id.* ¶ 40.

In or around 2014 or 2015, Defendant Cetera acquired control and ownership of Legend and assumed an interest in all of Legend's business affairs, including the operation and

4

performance of Legend's branch organizations. *Id.* ¶ 42. Cetera was effectively doing business directly and indirectly with the Drewes because it assumed oversight of Legend's affairs, appointed Legend's chief executive officer, and treated that officer as its own agent acting on behalf of and at the behest of Cetera. *Id.* ¶ 42.

Legend's CEO was acting as Cetera's agent and at Cetera's direction. *Id.* ¶ 42. One of the business activities involved a review of all of Legend's obligations and exercising influence over those obligations, a process by which Cetera interlaced itself in the business affairs of Legend's branches. *Id.* ¶ 42. One of the things Cetera did was to stop the payment of John's overrides, which would not have happened but for changes introduced by Cetera. *Id.* ¶ 42.

Then in 2016, Cetera and Cetera's then president, Adam Antoniades, developed a plan to sell Legend to Lincoln Investment Capital Holdings, L.L.C. and Lincoln Investment Planning, L.L.C. (collectively, "Lincoln"). *Id.* ¶ 42. Defendants, Lincoln, and Fisher participated in a plan and conspiracy to cancel the Program to enhance the value of Legend and the Branch to Lincoln by eliminating or severely reducing the liability that the Program represented, while pocketing the gains for themselves. *Id.* ¶ 42. During that process, Cetera was engaging in direct communication with Fisher as Branch principal and president in making preparations for the Lincoln purchase and Program cancellation, while instructing Fisher to conceal those communications from his shareholders. *Id.* ¶ 42.

Cetera negotiated the sale of Legend to Lincoln. *Id.* ¶ 43. As part of the purchase process, between June and August 2016, Defendants enlisted Fisher's assistance in the development of a plan to cancel the Program. *Id.* ¶ 44. At Legend, Lincoln, Antoniades, and at Cetera's direction, Fisher, who was acting president of GFA, agreed to withhold the disclosure of plans for Program

cancellation from Plaintiffs, thereby preventing them from taking measures to protect their book of business and re-establishing their clientele with a broker dealer which offered the Program. *Id.* ¶¶ 45-46.

In September 2016, Legend announced that the Program was being terminated in order to comply with "regulatory guidance." *Id.*   ¶¶ 48-49. The announcement was sent by Legend CEO, Shashi Mehrotra, at Antoniades' direction. *Id.* ¶¶ 48-50. Prior to that date, on or about June 13, 2016, in a meeting held in Orlando, Florida with selected Lincoln and Cetera executives, and with Fisher present, Antoniades stated that Legend was under no legal obligation to continue the Program due to regulatory considerations. *Id.* ¶ 52.   However, "there was no regulation or change of regulation that justified the cancellation of the Program" and Defendants knew it.   *Id.* ¶¶ 54-55.   At the time of both of those representations, Antoniades was acting as president of Cetera and made the statements as part of the process of selling Legend to Lincoln at a better price, by reducing the stated liabilities of Legend for payments due under the Program. *Id.* ¶ 53.

In the purchase agreement between Cetera and Lincoln for the purchase and sale of Legend, the parties expressly set forth not only how the gains and liabilities of the Program cancellation would be shared, but also the process by which first Cetera and Antoniades, and later Lincoln, would take measures to prevent branch owners, including Plaintiffs, from moving their books of business to competitors of Legend who offered similar programs. *Id.* ¶ 56. Defendants were thus able to take the collective value for the Program for themselves and, in a manner subsequently discovered, retained, apportioned, or shared Legend's liabilities, including those associated with cancelling the Program, with Lincoln. *Id.* ¶ 57.

Upon learning that the Program was to be cancelled, John's attempts to transfer his business

to James was thwarted by Fisher and Edward Forst, a representative of Lincoln. *Id.* ¶ 61. A major objective of their plan was to transfer John's book of business to Lincoln and Fisher without having to compensate Plaintiffs. *Id.* ¶ 61. That objective was ultimately achieved after Lincoln acquired Legend in July of 2018, when Lincoln closed the Branch, moved John's book of business to a new Branch established by Fisher, and terminated Plaintiffs' registration. *Id.* ¶ 61. In the year leading up to that transfer, Lincoln and Fisher depleted the value of Plaintiffs' interest in the Branch by cancelling John's overrides and other fees (which had been promised and assigned to James) and taking those fees for themselves. *Id.* ¶ 61.

The reason given for stopping the payment of his overrides directly was Legend's failure more than 10 years earlier to have filed the necessary registration documents. It was Legend's obligation to do so, though Legend continued to pay John his overrides because it did not believe that a Series 65 license was necessary for the payment of those overrides to John. *Id.* ¶ 62. Legend then used the lack of registration of John's Series 65 license as a reason for non-payment of John's overrides, even though John had retained his Series 6 license, which was sufficient for him to receive overrides under the existing regulations. *Id.* ¶ 63.

Defendants perpetrated this injustice by falsely representing to Legend personnel that John's Series 6 license, without a Series 65 license, was insufficient to continue payment of his overrides. *Id.* ¶ 64. Antoniades made that representation to Legend personnel with the intent and expectation that it would be communicated to John and induce him to acquiesce to the nonpayment or take nonpayment as a prompt to move his business elsewhere. *Id.* ¶ 64.

On September 2, 2016, while studying for the Series 65 exam so that he could restore the license that Legend had allowed to lapse, John suffered a major stroke and was rendered incapable

of performing difficult cognitive tasks, including effectively negotiating or opposing contractual terms with Legend, or moving his business to another broker dealer. *Id.* ¶ 65.   He was also 77 years old. *Id.* ¶ 65.

Seizing on John's debilitated state, Defendants demanded that he sign an agreement to release his rights to the Program— at that point worth over $15 million to him—in exchange for a $25,000 payment and "other valuable consideration."   The $25,000 payment was for overrides that were already owed to him but had not yet been paid.   *Id.* ¶ 68. The promise of assignment to James and his placement in the role of principal of the Branch was the "other consideration" contemplated by the release. *Id.* ¶ 80. The release was presented to him by Fisher, who was at the time acting in concert with Cetera and Antoniades. *Id.* ¶ 69. The "other valuable consideration" referred to arrangements that John had been making to assign his right to receive overrides to his son James, and to replace Fisher with James as the principal of the Branch, meaning, that he would serve as the general manager of the Branch and primary liaison between the Branch and Lincoln. *Id.* ¶ 69.   James had all the licenses and qualifications necessary to act as principal and manager of the Branch and was ready willing and able to assume that position. *Id.* ¶ 69.

Defendants had also influenced Legend and Fisher to reduce the distributions John was entitled to receive through his corporate ownership of the Branch, and communicated to John, through Legend and Fisher, that if he did not release his interests in the Program, he would never be paid again in any form, and would, in effect be left without the means of supporting himself while struggling with a major disability. *Id.* ¶ 73. These actions not only caused John to release his interest in the Program but set in motion a series of events that enabled the subsequent theft of Plaintiffs' business. *Id.* ¶ 74.

Defendants essentially communicated to Lincoln that it owned the Plaintiffs' business, and could thus transfer the Plaintiffs' trade secrets, employees, and client lists to Lincoln without any legal encumbrance or liability. *Id.* ¶ 76. They knew there was little that John could do about it, because he had become disabled, and Defendants refused to acknowledge James' rights as John's successor, all as part of a scheme to sell the Plaintiffs' business to Lincoln, without paying Plaintiffs. *Id.* ¶ 76.

At the time Legend promised to assign John's overrides to James and to replace him as principal and controller of the Branch, Defendants had no intention to allow Legend to honor the promise. *Id.* ¶ 78. Neither Legend nor Lincoln made the promised transfer of control, and 15 months later, in February 2018, Lincoln cancelled payments to James claiming that it had "no contractual basis" for such payments, and that Fisher—who held a minority interest in the Branch—could stop the payment of overrides even though it violated the legitimate interests of his majority shareholders. *Id.* ¶ 78.

By July 2018, Lincoln had formed another branch with Fisher in competition with the Branch and directed Fisher to take all the representatives and their clients to the newly formed branch. *Id.* ¶ 79.

### B. Counts and Affirmative Defenses At Issue on Summary Judgment

Plaintiffs initiated this action by filing a complaint on April 16, 2019. [DE 1]. The operative complaint contains twelve counts. [DE 73].   However, after this Court's ruling on Defendants' Motion to Dismiss, nine counts remain at this stage of the litigation.   [DE 108]. Specifically, Plaintiffs allege the following nine counts against all Defendants: Count I alleges intentional interference with contract [DE 73 ¶¶ 81-86]; Count II alleges intentional interference with

prospective economic advantage [*id.* ¶¶ 87-93]; Count III alleges constructive fraud (breach of fiduciary duty) [*id.* ¶¶ 94-99]; Count IV alleges conspiracy to commit constructive fraud [*id.* ¶¶ 100-08]; Count V alleges aiding and abetting constructive fraud [*id.* ¶¶ 109-113]; Count VI alleges exploitation of an elderly adult or disabled person [*id.* ¶¶ 114-120]; Count VII alleges conspiracy to exploit an elderly adult or disabled person [*id.* ¶¶ 121-29]; Count VIII alleges fraudulent misrepresentation [*id.* ¶¶ 130-39]; and Count IX alleges negligent misrepresentation [*id.* ¶¶ 140-46]. The sum of Plaintiffs' case is that regulatory guidance in the form of a no-action letter is not the basis on which to terminate a contract; Defendants' true motivation was to convince Legend to cancel the Legacy Program to make its sale to Lincoln more attractive; and to cancel the Legacy Program under the guise of mandatory regulatory changes so that Plaintiffs and people like Plaintiffs would acquiesce to the cancellation, sign a release without being fully informed, and accept a nominal sum, instead of what had been promised to be enough to live on in retirement.

Defendants answered and asserted certain affirmative defenses. [DE 123]. The affirmative defenses at issue in Plaintiff's Motion for Partial Summary Judgment are those relating to justification (affirmative defense No. 1); the existence of a terminable at-will contract (affirmative defense No. 2); the existence of a general release signed by John (affirmative defense No. 5); the existence of a general release signed by John and the failure to return consideration paid for the general release (affirmative defense No. 8); and economic interest (affirmative defense No. 9). [DE 139].

## II. PLAINTIFFS' SUGGESTION OF DEATH AND MOTION TO SUBSTITUTE PARTY

Plaintiffs filed a Suggestion Of Death and Motion to Substitute Party on November 12,

2021. [DE 200]. Plaintiffs suggest the death of Plaintiff John Drewes occurred on October 31, 2021. James Drewes (John's son) is now the Trustee of the Drewes Family Trust and also named individually in this case.   Defendants filed a response, stating that the request to substitute Plaintiff James Drewes, as Personal Representative of the Estate of John Drewes in place of the late Plaintiff John Drewes as a party to this litigation is unopposed, reserving all defenses to such substitution in light of the pending probate proceeding in Indiana. [DE 209]. Accordingly, the Court will allow the substitution of Plaintiff James Drewes, as Personal Representative of the Estate of John Drewes in place of the late Plaintiff John Drewes as a party to this litigation.[2]

### III.   DEFENDANTS' MOTION TO DISREGARD THE DECLARATION OF MARK SPINELLO

Defendants asks the Court to disregard certain paragraphs from the Declaration of Mark Spinello in connection with resolving Defendants' Motion for Summary Judgment because (1) Spinello's statements constitute improper lay opinion and thus are inadmissible; (2) Spinello's statements are inadmissible evidence because they are legal conclusions; (3) Spinello's statements are inadmissible because his deposition testimony establishes his lack of personal knowledge to address the Program; (4) Spinello's statements are inadmissible because Plaintiffs offer them to explain otherwise unambiguous provisions of the Program and their respective Independent Contractor Agreements ("ICAs"); (5) Spinello's statements are inadmissible because they violate the parol evidence rule; (6) some of Spinello's statements comprise a sham affidavit, which is subject to being stricken by the Court, because his statements conflict directly with his deposition

---

[2] However, because the parties briefing in summary judgment concluded prior to John's death and subsequent substitution as a party, the Court refers to John as a Plaintiff throughout the instant Order.

testimony and he has not provided any explanation for this discrepancy; and (7) Spinello's Declaration referencing advice supposedly received from Legend's outside counsel is an impermissible attempt to use privileged communications as both a "sword" and "shield" in contravention of Florida law.

In response, Plaintiffs essentially argue that Spinello's declaration goes to his intent. For example, his statements go towards proving the type of relationship he intended to create with the Program. *See* DE 186 at 3 ("For purposes of this case, there is no material difference in stating 'we were obligated' and stating 'we intended to be obligated,' because both identify the perception and expectation of the one tasked to define the legal relationship.").

As clarified during oral argument, Spinello is not an expert in this case, all of the at-issue declarations of Spinello should be read only as to what he intended and his state of mind, and the Court should disregard the declaration to the extent his statements are legal opinions or are otherwise inadmissible. As stated in open Court, the Court will only consider the declaration for admissible statements as applicable to the instant motions for summary judgment.

## IV.    SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (internal quotations and alterations omitted).

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court also must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## V.    STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE[3]

---

[3] The following facts are drawn from the uncontested portions of the record together with the parties' statements of material facts and supporting evidence, and these facts are viewed in the light most favorable to the non-moving party. Here, both Plaintiffs and Defendants have filed Motions for Summary Judgment; therefore, the facts are viewed in the light most favorable to the non-moving party in light of their respective arguments on summary judgment. To the extent a party has acknowledged that the opposing party's fact is "undisputed," the fact will be treated as undisputed for purposes of the pending motions. Where the response states that the fact is undisputed but not material, the Court has conducted a separate materiality assessment. Each party asserts that some of the opposing party's proposed facts are not properly supported by the evidence cited; therefore, to the extent a party fails to cite record evidence in support of an alleged fact, that

**A.  Relationship Between the Parties**

Legend Equities Corporation ("LEC"), Legend Advisory Corporation ("LAC"), Advisory Services Corporation ("ADSERV"), and The Legend Group, Inc. ("LGI") were wholly owned subsidiaries of Legend Group Holdings, LLC (collectively referred to herein as "Legend"). [DUSMF[4] ¶ 1; Ex 1, Ex. 2 ¶ 10].   LEC was a securities brokerage firm that was registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") from July 1993 until March 2017. [DUSMF ¶ 2; Ex. 3].

Plaintiffs are former independent contractors of Legend. [DUSMF ¶¶ 3-4; Ex. 4, 5]. Defendant Cetera is a Delaware corporation with its principal place of business in El Segundo, California. [DUSMF ¶ 5; *see* DE 73 ¶ 4; DE 123 ¶ 4]. Cetera is not a securities broker-dealer or investment adviser registered with the SEC and is not a member of FINRA. [DUSMF ¶ 6; Ex. 2 ¶3].   Plaintiffs never had any employment or affiliation with Cetera or Antoniades. [DUSMF ¶ 7; Ex. 2 ¶ 13].   Plaintiffs never had any contract with Cetera or Antoniades. [DUSMF ¶ 8; Ex. 2 ¶ 15].

In 2016, Legend was a wholly owned subsidiary of First Allied Holdings Inc., which in turn was a wholly owned subsidiary of RCS Capital Holdings LLC, which in turn was a wholly owned subsidiary of RCS Capital Corporation. [DUSMF ¶ 9; Ex. 6; Ex. 2 ¶¶ 6, 8].

---

alleged fact will not be considered proven. To the extent the parties' statements of material facts contain argument and characterizations of the facts, the Court has extracted the underlying facts from the record and ignored said characterizations. To the extent a fact is labeled "disputed" but is clearly undisputed by the record evidence, the Court will consider the fact to be undisputed.

[4] The parties' submissions of facts that are undisputed or considered undisputed as it relates to Defendants' Motion will be referred to as the Defendant's Undisputed Statement of Material Facts ("DUSMF").

In 2016, Cetera was a wholly owned subsidiary of Cetera Financial Holdings, Inc., which in turn was a wholly owned subsidiary of RCS Capital Corporation. [DUSMF ¶ 10; Ex. 6; Ex. 2 ¶ 7]. Antoniades served as president of Cetera in 2015 and 2016. [DUSMF ¶ 12; Ex. 6; Ex. 2 ¶ 9]. In 2016, Antoniades served as director to ADSERV, LEC, LAC, LGI, and LEC Insurance Agency, Inc. [DUSMF ¶ 13; Ex. 8].

Fisher and John were business partners together since 1984, had a book of business together when they joined Legend, and did not sell the book of business to Legend. [DUSMF ¶ 14; Ex. 9 at 13:2-20, 14:6-11; PUSM[5] ¶ 73; Pls Ex. Q 14:10-23]. John, James, and Fisher co-owned GFA. [DUSMF ¶ 15; DE 73 ¶ 21]. Through GFA, John, James, and Fisher co-owned the Branch, made up of representatives that were registered with Legend. [DUSMF ¶ 16; DE 73 ¶ 11, 13].

On October 4, 1995, James entered into a Sales Representative and Solicitor Agreement with Legend (hereinafter, Independent Contractor Agreement, or "ICA"). [DUSMF ¶ 19; Ex. 5].[6] On September 10, 2000, John entered into a Retirement Advisor Agreement with Legend (hereinafter, Independent Contractor Agreement, or "ICA"). [DUSMF ¶ 18; Ex. 4]. The ICA signed by John in September 2000 was operative between John and Legend until the sale of Legend to Lincoln, discussed *infra*. [PUSMF ¶ 61; Pls Ex. I at 41:3-9; 42:4-10; 42:19-43:1; 44:11-21; Pls' Ex. 26].

Plaintiffs' respective ICAs stated that "[n]othing contained in this Agreement shall be

---

[5] The parties' submissions of facts that are undisputed or considered undisputed as it relates to Plaintiffs' Motion will be referred to as the Plaintiffs' Undisputed Statement of Material Facts ("PUSMF").

[6] James signed only one sales representative ICA with Legend. PUSMF ¶ 86; Pls Ex. F at 54:6-10.

construed to create the relation of employer and employee between the Retirement Advisor and the Group or the Providers. Retirement Advisor shall in no manner consciously represent to the public that any relationship, other than that of the independent contractor, exists between the Retirement Advisor and [Legend], or any other company unless specifically set forth." [DUSMF ¶ 20; Ex. 4; Ex. 5]. Under their respective ICAs, Plaintiffs' sole compensation was "compensation earned with respect to all sales resulting" from Plaintiffs' solicitation efforts. [DUSMF ¶ 21; Ex. 4; Ex. 5].

John's ICA required him to comply with all federal and state statutes and regulations and self-regulatory organization ("SRO") rules. [DUSMF ¶ 23; Ex. 4]. James' ICA required him to comply with all federal and state statutes and regulations and SRO rules. [DUSMF ¶ 24; Ex. 5]. As long as Plaintiffs followed applicable laws, rules and regulations, Plaintiffs were free to exercise their own judgment when running their business. [DUSMF ¶ 27; Ex. 4; Ex. 5; Ex. 10 at 75:5-14]. John's ICA provided that the "terms, conditions, and covenants herein embodied comprise the entirety of the Agreement…, either oral or in writing[,]" and prohibited modification except in "writing jointly subscribed to by the parties hereto." [DUSMF ¶ 28; Ex. 4]. James' ICA stated that the "terms, conditions, and covenants herein embodied comprise the entirety of the Agreement," and that the Agreement may only be modified in writing. [DUSMF ¶ 29; Ex. 5].

John's ICA provided: "In accordance with the current state and federal laws, rules and regulations, should the Retirement Advisor's Agreement terminate as a result of death, disability or cessation of active solicitation, continuing compensation shall be paid according to the Legend Advisory Financial Security Program, as amended from time to time." [DUSMF ¶ 30; Ex. 4]. A copy of Legend's then-current Legend's Program was attached to John's ICA. [DUSMF ¶ 31; Ex.

16

4].

James' ICA provided: "In accordance with the current state and federal laws, rules and regulations, should the Representative's Agreement terminate as a result of death, disability or cessation of active solicitation, continuing compensation shall be paid according to the Group's Death, Disability and Cessation of Active Solicitation Schedule as amended from time to time." [DUSMF ¶ 32; Ex. 5]. A copy of Legend's then-current Death, Disability and Cessation of Active Solicitation Schedule was attached to James' ICA. [DUSMF ¶ 33; Ex. 5].

In the fall of 2014, Legend revised the Program and created two versions of it, a "New Version" and a "Legacy Program." Representatives were given the option to choose one or the other. [DUSMF ¶ 34; Ex. 11]. Plaintiffs selected the Legacy Program. [DUSMF ¶ 35; Ex. 12].

**B.  Assignment of Advisory Fee Overrides from John to James**

Before January 2016, as part owner of the Branch, John received an override on all advisory fees generated by other representatives of the Branch. [DUSMF ¶ 36; Ex. 13; Ex. 9 at 55:21-56:11]. Fisher and James, as co-owners of the Branch, also received such overrides. [DUSMF ¶ 38; Ex. 9 at 55:21-56:2].

An Investment Adviser Representative ("IAR") is a person who has a Series 65 license, a combination of Series 7 and 66 licenses, or a designation that qualifies for that exemption, such as Certified Financial Planner ("CFP"), Chartered Financial Consultant ("ChFC"), Personal Financial Specialist ("PFS"), Chartered Financial Analyst ("CFA") or Chartered Investment Counselor ("CIC"). [DUSMF ¶ 39 (citing Fla. Admin Code R. 69W-600.0024(6))].

John had a Series 6 license in 2015 and 2016; he did not have a Series 65 license, a combination of Series 7 and 66 licenses, or a designation that qualified for exemption from these

licensing requirements. [DUSMF ¶ 41; Ex. 16 at 9-10].

During a January 2016 conference call, Enrique Vasquez, CEO of Legend at the time, informed John that Legend had implemented a new rule prohibiting the payment of advisory fees to non-IARs, and because John was not an IAR, he could not receive any future advisory fee payments, including overrides, unless or until he became licensed as an IAR. [DUSMF ¶ 42; Ex. 9 at 75:11-78:8; Ex. 15 at 91:22-24, 92:20, 94:21].

When informed of the news that he could not receive overrides on advisory fees, John instructed Legend to make the advisory fee override payments to Fisher. [DUSMF ¶ 43; Ex. 9 at 79:5-8]. After Legend made the advisory fee override payments to Fisher, Fisher remitted the payments to John. [DUSMF ¶ 44; Ex. 9 at 79:12-24]. When the Legend Compliance Department learned that Fisher was paying the advisory fee overrides to John, Legend instructed Fisher to stop making the payments. [DUSMF ¶ 45; Ex. 9 at 79:12-24]. After Fisher stopped paying advisory fee overrides to John, Fisher paid an equivalent amount to John from the type of commissions and overrides that John was permitted to receive under his securities licenses. [DUSMF ¶ 46; Ex. 9 at 79:25-80:18].

Meanwhile, in July 2016, John took the Series 65 exam and failed. [DUSMF ¶ 47; Ex. 16 at 9]. John registered to take the Series 65 exam again in August and September 2016 and cancelled the exam both times because he had suffered a stroke, discussed *infra*. [DUSMF ¶ 48; Ex. 16 at 9; DE 163-1].

On November 15, 2016, John assigned the advisory fee overrides to his son, James. [DUSMF ¶ 49; Ex. 18; Ex. 19 at 61:1-62:9, 63:22-65:3]. After John assigned the advisory fee overrides to James, Legend paid James the advisory fee overrides. [DUSMF ¶ 50; Ex. 17; Ex 9 at

169:4-7].

### C.  John's Stroke and the Termination of the Legacy Version of the Program

The version of the Program applicable to Plaintiffs, and in effect during from 2015 through September 12, 2016, was the Legend Advisor Financial Security Program-LEGACY Version dated September 2014 (hereinafter, "Legacy Program."). [DUSMF ¶ 51; Ex. 10; Ex. 12]. The Legacy Program stated that it was incorporated into the Financial Advisor's independent contractor agreement. [DUSMF ¶ 52; Ex. 20 at 1]. The Legacy Program stated that it was subject to current state and federal laws and industry rules and regulations. [DUSMF ¶ 53; Ex. 20 at 1].

FINRA Rule 2040 replaced [NASD] IM-2420-2 and became effective on August 24, 2015. [DUSMF ¶ 56; Ex. 21]. The Legacy Program applied to payments to a Financial Advisor after death, disability or cessation of active solicitation. [DUSMF ¶ 57; Ex. 20 at 1]. The Legacy Program defined "cessation of active solicitation" as retirement from the financial services industry. [DUSMF ¶ 58; Ex. 20 at 1]. The Legacy Program included Program Compliance Parameters. [DUSMF ¶ 59; Ex. 20 at 5-7].   The Legacy Program stated that "Legend may unilaterally alter the Program and/or the Program Compliance Parameters at any time, with no further liability to Financial Advisor… in order to comply with applicable industry laws, rules, regulations, or other requirements and official guidance by any regulatory body or SRO." [DUSMF ¶ 61; Ex. 20 at 2].

John had a stroke on September 2, 2016 and was released from the hospital on September 7, 2016. [PUSMF ¶ 56; Ex. H: Beth Drewes Depo. (2-19-2021) 22:19-24; Ex. K: John Drewes Depo. (2-19-2021) 80:6-14].

Shortly after his stroke, on September 7, 2016, Plaintiffs notified Legend personnel that

19

John had had a stroke and would not be able to sit for his Series 65 examination. They also submitted a notice to FINRA that he would not be able to take the examination because of his stroke. [PUSMF ¶ 17; Ex. 1, Decl. James at ¶ 7; Ex. 13, Notice to FINRA dated September 7, 2016].

Legend announced through its CEO, Mehrotra, that the Legacy Program was cancelled effective September 10, 2016.   [PUSMF ¶ 13; Ex. 8, Letter to John Drewes dated September 10, 2016; Ex. 9, Email Announcement from Mehrotra dated September 12, 2016]. Legend announced that it was immediately terminating all past and current versions of the Program because it was "no longer supported by regulatory guidance." [DUSMF ¶ 62; Ex. 22]. Antoniades made the decision "with [Cetera] counsel." [PUSMF ¶ 15; Ex. 12]. Deidre Link, in-house counsel with Cetera, was involved with preparing a template release related to the Program. [PUSMF ¶ 96; Ex. V].

Mehrotra was offered and received a $100,000 transaction bonus by Cetera for his assistance in the sale of Legend to Lincoln and that arrangement was not disclosed to John or James. [PUSMF ¶ 21; Ex. 11; Ex. 1, Decl. James at ¶ 8]. Mehrotra was one of John's oldest and most trusted friends. [PUSMF ¶ 19; Ex. 1, Decl. James Drewes ¶ 8].

On September 10, 2016, Legend mailed a letter to John announcing the termination of the Legacy Program of the Program and informing him that he would receive an additional communication "in which Legend will offer to make a lump sum payment to you under certain terms and conditions." [DUSMF ¶ 63; Ex. 23]. Legend developed a payment plan for retirees that were participating in the Program as of September 2016. Program participants that received less than $10,000 per year from the Program were placed on "Tier 1" and offered lump sum payments

based on their prior earnings. Program participants that received more than $10,000 per year from the Program were placed on "Tier 2" and offered ongoing quarterly fixed payments based on the average income received in prior years from the Program. [DUSMF ¶ 64; Ex. 24; Ex. 25]. John was placed on Tier 1. [DUSMF ¶ 65; Ex. 26]. The regulatory basis for the cancellation of the Program was also not disclosed, except to state, "regulatory guidance" made it "necessary." [PUSMF ¶ 31; Ex. 8, Letter to John Drewes Dated September 10, 2016; Ex. 9, Email Announcement from Mehrotra dated September 12, 2016; Ex. 1, Decl. James Drews ¶ 10].

On September 29, 2016, Legend mailed a letter to John offering a lump sum payment of $25,501.14 in exchange for a general release. The letter encouraged John to "review the Release carefully" and gave him more than 30 days to accept the offer. [DUSMF ¶ 66; Ex. 27 at 1].   The release states that John agreed, on his own behalf, as well as on behalf of his beneficiaries, agents, assignees, attorneys, heirs, executors, administrators and spouse, to release the "Legend Parties" from any and all potential or actual claims related to the Program, including potential or actual claims related to amounts he expected to receive under the Program, potential or actual claims related to the termination of the Program, and any potential or actual claims arising out of the operation, administration, and/or termination of the Program. [DUSMF ¶ 67; Ex. 27 at 2].   The release defines the "Legend Parties" as Legend Group Holdings, LLC, "Legend Equities Corporation, Legend Advisory Corporation, LEC Insurance Agency, Inc., and their prior, present and hereafter existing affiliates, parents and subsidiaries, and all of their respective prior, present and hereafter existing directors, officers, executives, employees,… assigns and divisions." [DUSMF ¶ 68; Ex. 27 at 1].   The release also provides that it is "the entire agreement of the parties and supersedes any other agreements between the parties, either verbal or written regarding the

Financial Security Program. You acknowledge that no representations, inducements, promises, or agreements, verbal or otherwise, have been made to you… which are not embodied herein, and that no other agreement, statement or promise not contained herein shall be valid or binding." [DUSMF ¶ 69; Ex. 27 at 3].

The release states that it will be interpreted under the laws of the State of Florida. [DUSMF ¶ 70; Ex. 27 at 2].   The cover letter transmitting the release agreement to John repeated that the Program was cancelled for regulatory reasons, without explaining those reasons. [PUSMF ¶ 34; Ex. 14, Letter to John Drewes with release agreement date September 29, 2016].

John spoke with Mehrotra and Fisher about the settlement offer and release prior to signing it. [DUSMF ¶ 71; Ex. 17 at 88:9-89:12, 90:9-92:8, 107:5-9, 108:15-109:16].

John spoke with Mehrotra either the day that he received the October 14, 2016 letter or the next day. [PUSMF ¶ 63]. This letter is the one that included a general release relating to the Program. [PUSMF ¶ 63; Ex. L].

Prior to signing the release, John discussed it with Fisher by telephone. [PUSMF ¶ 65; Ex. K 90:7-15].   At the time John signed the release, Fisher served as Branch principal, which made him the liaison in communications between Legend and other Branch owners, managers and representatives. [PUSMF ¶ 23; Ex. 1, Decl. James ¶ 9].

On October 10, 2016, John signed the release. [DUSMF ¶ 72; Ex. 28].   John did not seek legal advice prior to signing the release. [DUSMF ¶ 73; Ex. 14 at 94:3-5].

On October 14, 2016, Legend issued a payment to John of $25,501.14. [DUSMF ¶ 74; Ex. 29].   John received the payment of $25,501.14 and has not returned it to Legend. [DUSMF ¶ 75; Ex. 14 at 89:13-16].

James was not aware that a release was sent to John in October of 2016. [Ex. G 56:16-18]. John never told James that he had signed a release. [PUSMF ¶ 56; Ex. Q: 57:11-25].

In October and November 2016, James told Fisher that John had suffered a stroke, was hospitalized for a number of days, was recuperating at home and was getting better. [PUSMF ¶ 80; Ex. Q: S. Fisher Depo (2/10/2020) 189:21-190:1].

By November 15, 2016, John had recovered sufficiently from his stroke to be able to understand and sign the assignment of his override advisory fee income to James. [PUSMF ¶ 54; Ex. G: James Drewes Depo. Volume II (2-16-2021) 64:13-18].

### D. Lincoln Purchased Legend

On September 13, 2016, FAH entered into an agreement with Lincoln to sell Legend to Lincoln. [DUSMF ¶ 77; Ex. 1].   The purchase transaction closed in January 2017. [DUSMF ¶ 78; Ex. 30 at 13:24-25].

After John became affiliated with Lincoln, he did not spend much time in the Branch office and instead wrote sales reports, newsletters and bulletins, and addressed the documentation needed for GFA. [PUSMF ¶ 49; Ex. D: John Drewes Arizona State Court Depo. Volume I (12-18-2018) 145: 6-15].

James signed a Financial Advisor Agreement for Lincoln on November 30, 2016. [DUSMF ¶ 80; Ex. 31].   James became registered with Lincoln on January 3, 2017. [DUSMF ¶ 81; Ex. 32 at 6].

John signed a Financial Advisor Agreement for Lincoln on December 2, 2016. [DUSMF ¶ 82; Ex. 33]. John became registered with Lincoln on January 3, 2017. [DUSMF ¶ 83; Ex. 16 at 5]. Since January 3, 2017, Plaintiffs have not been registered with, employed by or been the agent of

any parent, subsidiary or affiliate of Defendants. [DUSMF ¶ 84; Ex. 16 at 5; Ex. 32 at 6].

On February 21, 2018, Fisher instructed Lincoln not to pay John's overrides to James. [DUSMF ¶ 86; Ex. 34; Ex. 30 at 213:3-215:6]. Lincoln followed Fisher's instructions and withheld payment to James of John's override payments. [DUSMF ¶ 87; Ex. 30 at 213:3-215:6].   Fisher did not consult with Defendants when he instructed Lincoln to stop override payments to James. [DUSMF ¶ 88; Ex. 35:71-73:14]. Fisher was not an employee or agent of either Cetera or Antoniades. [DUSMF ¶ 101; Ex. 2 ¶¶ 16, 17].

In July 2018, Fisher began operating a new branch under the name Suncoast Wealth Solutions. [DUSMF ¶ 90; Ex. 9 at 9:24-10:4]. Fisher did not discuss the creation of Suncoast Wealth Solutions with Defendants. [DUSMF ¶ 91; Ex. 9 at 223:22-224-3]. Lincoln terminated its relationship with Plaintiffs in July 2018. [DUSMF ¶ 92; Ex. 36; Ex. 37].

On July 31, 2018, James became registered with GWN Securities Inc. ("GWN"). [DUSMF ¶ 93; Ex. 32 at 5]. GWN offers a continuing compensation program to GWN representatives upon retirement from active solicitation. [DUSMF ¶ 95; Ex. 38].

## VI.    DISCUSSION AND ANALYSIS

Defendants seek summary judgment on all remaining counts in the operative complaint. Defendants argue that all of Plaintiffs' claims are precluded by the release, and even if Plaintiffs' claims are not barred by the release, Defendants are entitled to summary judgment as to each count.

Plaintiffs seeks partial summary judgment[7] on certain of Defendants' affirmative defenses

---

[7] Plaintiffs request that the Court strike certain affirmative defenses as insufficiently pled is denied as untimely. Under Rule 12(f)(2) of the Federal Rules of Civil Procedure, Plaintiff was required to file its motion to strike a pleading "within 21 days after being served with the pleading." Defendants filed the operative answer on January 19, 2021 [DE 123], and filed the instant Motion seeking to strike certain

relating to justification; the existence of a terminable at-will contract; the existence of a release signed by John; the existence of a release signed by John and the failure to return consideration paid for the release; and economic interest. [DE 139].

For purposes of efficiency, the Court will address both summary judgment motions simultaneously, where appropriate. For the reasons set forth below, the Court finds that the granting of summary judgment is inappropriate for either party in this case as neither Plaintiffs nor Defendants have met their burden to take the required findings relevant to the pending counts and affirmative defenses away from the jury; therefore, this case shall be determined by a jury at trial.

**A.  The Release[8]**

Defendants argue that all of Plaintiffs' claims are precluded by the release, and as a result, Defendants are entitled to summary judgment on all counts alleged in the complaint.   Specifically, the release signed by John includes any claims against Defendants arising from the Program; and Plaintiffs' claims of incapacity, fraudulent inducement, and duress do not meet the high standards necessary to void the release.

---

affirmative defenses on April 5, 2021. Accordingly, the Court will review Plaintiffs' arguments under the summary judgment standard.  *See Felicia v. Celebrity Cruises, Inc.,* No. 12–20477–CIV, 2012 WL 6869828, at *1 (S.D. Fla. Nov. 14, 2012) (denying as untimely motion to strike affirmative defenses where the plaintiff waited "nearly seven months" after the answer was filed to move to strike the affirmative defenses as insufficiently pled); *Sakolsky v. Rubin Mem'l Chapel, LLC.,* No. 07–80354–CIV, 2007 WL 3197530, at *2 (S.D. Fla. Oct. 26, 2007) (denying as untimely plaintiff's motion to strike affirmative defenses filed "over three months after Defendants' filed their Answer").

[8] It is undisputed that the general release at issue contained a Florida choice-of-law provision and that Florida law applies. [DUSMF ¶ 70]. *See Burger King Corp. v. E-Z Eating*, 572 F.3d 1306, 1313 n.9 (11th Cir. 2009) (noting that Florida courts, and federal courts in Florida with diversity jurisdiction, "will enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.").

Plaintiffs respond in opposition, arguing that the release is unenforceable because the release improperly releases ongoing and future intentional torts; the release is unconscionable; the release is violative of a public policy; the release was signed by fraudulent inducement; the release was procured through duress or undue influence; and there is no tender back of John's payment because there is a dispute as to whether the payment was made for something other than the value of the release.

In addition, Plaintiffs argue that summary judgment should be granted in their favor with respect to the Defendants' affirmative defenses as it relates to the release because, as a matter of law, the release defense does not absolve Defendants of liability for contractual interference; Defendants cannot prove that a valid contract releasing Defendants existed; the release is unconscionable; and the monies paid to John were being paid for something other than the value of the release. Defendants respond in opposition that the release is valid and releases all claims, it does not contravene public policy, is adequately supported by sufficient consideration, is not unconscionable, and Plaintiffs retained the benefit of the release.

The Court finds that both Motions are denied as they relate to the release. The Court cannot determine as a matter of law that the release prevents all of Plaintiffs' claims in this case, nor can the Court determine that the release is unenforceable as a matter of law. There are factual disputes preventing summary judgment as it relates to the release, and the facts and circumstances surrounding this issue will be determined by the trier of fact after it has the opportunity to consider all the relevant evidence and the opportunity to make credibility determinations at trial.   In sum, this is a jury question.

After careful consideration, the Court disagrees with Defendants' position that the Court

should interpret the plain language of the release to make legal findings on summary judgment in this case. Although it is true that, as a general rule, the plain language of a contract is a question of law, the Court notes that this is not a breach of contract case between Legend and Plaintiffs. Moreover, Defendants are not named parties to the release at issue. *See* Ex. 27.

In addition, the facts and circumstances underlying the procurement of the release are disputed and are squarely at issue in this case. Plaintiffs presented evidence that John was elderly, deaf, struggled with communication, and had been impaired by a recent stroke when he was asked to sign the release by a trusted friend, the CEO of Legend, who had knowledge that John had suffered a stroke about a week before the Program cancellation was announced. *See, e.g.*, PUSMF ¶ 16; Ex. 1, Decl. James, 1 at ¶¶ 6-8; Ex. 14, Depo. Enrique Vasquez. Plaintiffs also presented evidence that Defendants' involvement in procuring the release was intentionally not disclosed to Plaintiffs in order to get John to agree to sign it, and that the CEO of Legend promised John that James would continue to control and get payments from the Branch. *See, e.g.*, Ex. 1, Decl. James at ¶¶ 6-11; Ex. 8, Depo. Shashi Mehrotra; Ex. 10, Depo. Antoniades; Ex. 11, Depo. Steve Fisher; Ex. 14, Depo. Enrique Vasquez; Ex. 17, Lincoln Purchase Agreement. Plaintiffs put forth evidence that the release is not supported by sufficient consideration, and there is a disputed material fact as to whether the lump sum payment to John was for the transfer of his personal book of business to James so that this amount was owed to him already, thus, he was not paid anything in exchange for the release. *See, e.g.*, PUSMF ¶ 30; Ex. 1, Decl. James ¶ 13; Ex. 16 pp. 152:9-153:20. By contrast, Defendants presented evidence that John was fully informed when signing the release, that John possessed sufficient intelligence to enter into a contract at the time he signed the release, that improper means and motives were not used to procure John's signature, that there were no

additional representations made by Legend's CEO, that the release encompassed all claims against Defendants, that the payment was sufficient consideration, and that the amount was the equivalent of three years of future payments. *See, e.g.*, DUSMF ¶ 71; Ex. K, John Drewes Depo; Ex. I; Ex. G, James Drewes Depo; Ex. 25.

Given that there is evidence in the record to support the parties' respective positions as they relate to the release, the required credibility determinations, weighing of the evidence, and drawing of legitimate inferences will be determined by the jury. This Court will not make credibility determinations on summary judgment. Accordingly, both motions for summary judgment are denied as it relates to the release.

## B. Tortious Interference Claims and Related Defenses

Plaintiffs allege that they entered into a contract with Legend and the business relationship involved a contractual agreement between Legend and Plaintiffs to provide Plaintiffs benefits under the Program and Legacy Program, to restore control of the Branch to Plaintiffs, and to assign commissions and overrides from John to James. [DE 73 ¶ 82, 83].  Defendants knew of these contractual expectations and took action to interfere with, defeat or disrupt those expectations.  *Id.* ¶ 84. These acts were committed by agents acting on behalf of Cetera, and by Antoniades, and included influencing the CEO of Legend to cancel the Program, resulting in the denial of program benefits to John at the time he was incapacitated and to James at the time Lincoln terminated his representative agreement. *Id.* Defendants also willfully failed to effectively communicate to Lincoln that Branch control was promised to James, and willfully failed to effectively communicate that James had a contractual right to receive an assignment of John's commissions and overrides. *Id.*

Plaintiffs allege that Plaintiffs and Legend had an advantageous business relationship central to the operation and profitability of the Branch. *Id.* ¶ 89. Defendants knew of the business relationship between Legend and Plaintiffs and intentionally interfered with and disrupted it by influencing Legend to cancel John's overrides; cancel John and James' Program benefits; withhold control of the Branch from John and James while instilling that control in Fisher; and by affirmatively stating to Lincoln during and after negotiations for its purchase of Legend that Legend had no obligations to restore control of the Branch to Plaintiffs or to assign John's rights of compensation to James. *Id.* Defendants' actions were unjustified in that they were made with an intent to disrupt longstanding obligations of trust between Plaintiffs, Fisher, and Legend, with the intent of avoiding liabilities associated with the Legacy Program's cancellation, and with the specific intention of depriving Plaintiffs of the value of business interests, business relationships and a retirement and disability Program that had accumulated for over twenty years. *Id.* ¶ 91.

Defendants' defense is that they were justified in recommending that the Legacy Program be cancelled because it did not comply with applicable statutes, regulations, and regulatory guidance; Legend did not breach any contract with Plaintiffs when it terminated the Program; and Defendants had an economic interest justifying their recommendation that Legend terminate the Legacy Program because Legend's continuations of a non-compliant compensation program exposed Legend to possible regulatory sanctions. [DE 123 at 19-21 (First, Second, Third, and Ninth Defenses)].

Defendants seek summary judgment on Plaintiffs' tortious interference claims, arguing that Legend did not breach contracts or the relationship between Plaintiffs and Legend; Defendants had an economic interest privilege; Defendants played no role in Lincoln's decision to stop making

override payments to James; Defendants played no role in Lincoln's alleged failure to restore control of the branch to Plaintiffs; and Defendants did not cause the damages alleged.

Plaintiffs respond in opposition, arguing that the Legacy Program represented a vested option contract; the Program was part of a business relationship that resulted in the formation of a fiduciary relationship; Defendants' actions were and still are appropriative and purposeful; and even if Defendants had a valid economic interest, their actions were improper and amount to bad faith.

In seeking summary judgment in Plaintiffs' favor on Defendants' justification affirmative defenses, Plaintiffs similarly argue that there is no privilege or justification as a matter of law. Defendants similarly respond that their behavior was justified because Defendants were not strangers to the contract and possessed a supervisory and financial interest in the performance of the Legacy Program, and Defendants merely provided truthful information to Legend regarding the Legacy Program.

Tortious interference with a contract and tortious interference with a business relationship require pleading virtually the same elements: (1) the existence of a contract or business relationship; (2) a defendant's knowledge of the contract or business relationship; (3) a defendant's intentional and unjustified procurement of a breach of the contract or interference with the relationship; and (4) damages as a result of a defendant's actions. *See Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018); *accord Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015). Whether the defendant interferes with a contractual or business relationship, that defendant must be a third party or a stranger to the business relationship. *Salit v. Ruden McClosky, Smith, Schuster & Russell,*

*P.A.*, 742 So.2d 381, 386 (Fla. 4th DCA 1999). Whether there is proper privilege to interfere "depends upon a balancing of the importance ... of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important." *Int'l Sales & Serv., Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (quoting *Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982)). Moreover, any asserted privileges are not available to those who use improper means. *Id.* at 1159. Finally, "[w]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *USI Ins. Servs. LLC v. Simokonis*, No. 15-CV-24337, 2016 WL 11547701, at *15 (S.D. Fla. Apr. 15, 2016), *report and recommendation adopted,* No. 15-24337-CIV, 2016 WL 11547699 (S.D. Fla. May 13, 2016); (quoting *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982)).

The Court finds that both Motions must be denied on the issue of tortious interference and the corresponding justification affirmative defenses. The facts surrounding the decision and motivation to terminate the Legacy Program and the relationship between the parties is hotly contested in this case and the Court cannot determine that one party prevails as a matter of law. Such disputes need to be determined by a jury.

There are a multitude of disagreements between the parties regarding the material facts on this issue and how those facts should be interpreted. Plaintiffs put forth evidence that Defendants intentionally caused Legend to terminate John's override payments with the motivation to limit

31

Legend's liabilities to get a better price for Legend in the sale to Lincoln, thus interfering in the contractual and business relationship between Plaintiffs and Legend. *See, e.g.*, PUSMF ¶ 21; Ex. 1, Decl. James, ¶ 9; Ex. 11, Depo. Shashi Mehrotra; Ex. 22; Ex. 15 p. 7; Ex. 14, Depo. Enrique Vasquez pp. 14:4-15:5. Plaintiffs presented sufficient evidence that the former Legend CEO was pressured to acquiesce to and endorse the cancellation and rubberstamped Defendants' determination that the Legacy Program was out of compliance. *See, e.g.*, Ex. 6, FINRA Arbitration Testimony of Shashi Mehrotra at pp. 30:18-31:24, 34:1-35:12, 36:15-37:22, 57:11-16, 80:5-18; Ex. 7, Depo. Shashi Mehrotra at pp. 17:7-18:4, 69:3-19. It is undisputed that the CEO of Legend was paid a $100,000 bonus for his assistance in the sale of Legend to Lincoln and that arrangement was not disclosed to John or James, and that the CEO of Legend was one of John oldest and most trusted friends. [PUSMF ¶¶ 19, 21].  Plaintiffs put forth evidence that there was no regulatory requirement to cancel the Legacy Program or the cancellation of his overrides, and there was no intention to transfer John's interest in the branch to James. *See, e.g.*, Ex. 1, Decl. James ¶ 18, Ex. 4, Decl. John ¶¶ 5, 6. By contrast, Defendants presented evidence that Legend properly terminated the Legacy Program; that the Legacy Program violated SEC guidance; that Plaintiffs were not entitled to payments under the Legacy Program; and that the Branch ultimately stayed with Lincoln after it purchased Legend, despite the fact that Lincoln did not have a continuing compensation program. *See, e.g.*, Ex. 2; Ex. 4; Ex. 5; Ex. 19; Ex. 20; Ex. 22; Ex. 31. Defendants also presented evidence that they were justified in advising Legend to terminate the Program—specifically, that they had an economic and supervisory interest in ensuring that Legend complied with applicable regulatory requirements, and that the Legacy Program was not being implemented properly. *See, e.g.*, Ex. 15 p. 84; Ex. 2 ¶¶ 6-8.

There are genuine issues of material fact as to whether Defendants prevented Legend from honoring their obligations to Plaintiffs, and whether Defendants' alleged conduct in procuring the cancellation of the Legacy program, by advising that the Program be cancelled due to the regulatory climate or changes in regulations, interfered with the business relationship between Plaintiffs and Legend. Given the conflicts in the evidence presented by both parties, both summary judgment motions on the issue of intentional interference and the corresponding justification affirmative defense are denied. The jury will determine all relevant facts, including whether or not the Defendants intentionally interfered in this case and whether any alleged interference was justified.

## C.  Misrepresentation

Plaintiffs allege that Defendants fraudulently or negligently made material false statements of fact regarding the Legacy Program. Specifically, (1) a February 1, 2016, statement by a Defendants' agent that John could no longer receive advisory fee overrides because he did not have a Series 65 license; (2) a statement made by Antoniades on June 13, 2016, that Defendants had "no obligation" to provide Legacy Program benefits or their equivalent due to regulatory prohibitions; and (3) a September 10, 2016 statement at Antoniades' direction that the Legacy Program is "no longer supported by regulatory guidance." [DE 73 ¶132]. Plaintiffs allege that all of these statements were false, that Defendants knew or should have known they were false, because John could have received overrides on advisory fees with only a Series 6 license, and that "there was no regulation or change of regulation that justified cancelling the [Legacy Program]." *Id.* ¶¶ 54, 63].   Plaintiffs allege that Defendants made the statements to Plaintiffs with the intent to induce John to accept cancellation of the Program as a regulatory matter, and Antoniades hoped

and expected that due to the longstanding dependency of Legend representatives on the regulatory expertise of Legend, these representatives would reassign their commission rights back to Legend, and sign releases of liability to Legend and its affiliated entities in exchange for a severely discounted buyout. *Id.* ¶ 135. Having been told that the Program was cancelled for regulatory reasons, John sought reassurance that he could make a binding assignment of his commissions and overrides to his son James, and to protect that assignment, that control of the Branch as principal would be transferred to James as well. *Id.* ¶ 136.  On those conditions John—who was incapacitated by a stroke—signed a release agreement submitted to him by Mehrotra and Fisher. *Id.* Mehrotra promised to assign John's compensation to James and to install James as principal of the Branch. *Id.* He made these promises with no intention of binding Legend or its successors, and apparently later told Lincoln that no such promises were made. *Id.* Antoniades' statements materially induced Plaintiffs to arrange to have overrides delivered to Fisher, who later failed to pay them to John.  *Id.* These statements also caused John to transfer his compensation to James and sign a release of liability to Legend. *Id.* Plaintiffs allege that but for Antoniades' statements, John would not have signed the release. *Id.* Also, but for the promises made by Mehrotra, acting on Cetera's behalf, John would not have signed the release. The release has been and is still used by Lincoln as a significant basis for the denial of any obligations to Plaintiffs. *Id.*

Negligent misrepresentation requires Plaintiffs to establish the following elements: "(1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted in a party acting in justifiable reliance upon the

misrepresentation." *Drilling Consultants, Inc. v. First Montauk Sec. Corp.*, 806 F. Supp. 2d 1228, 1236 (M.D. Fla. 2011). Fraudulent misrepresentation requires Plaintiffs to establish the following elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).[9]

On summary judgement, Defendants argue that Plaintiffs' misrepresentation counts fail as a matter of law because no misrepresentations were made and because there was no harm to Plaintiffs.   The thrust of Defendants' argument is that they were entitled to make changes to the Legacy Program, including adding the requirement that John be a IAR to receive his payouts, even if the law had not changed in this regard; that John was not harmed because he got around this new requirement by assigning his payouts to Fisher who then provided an equivalent amount from other sources; and because he was not entitled to receive payments under the Legacy Program.[10]

The Court finds that Defendants have not met their burden on summary judgment and there is sufficient evidence in the record that supports Plaintiffs' claims in viewing the evidence in their

---

[9] The elements of the two causes of action are nearly identical. The only materially different element is the second element—the degree of culpability of the speaker/writer—which is not an issue raised by Defendants in summary judgment. As such, these two counts can properly be analyzed together. Defendants also addressed the fraudulent misrepresentation count and the negligent misrepresentation count together in arguing for summary judgment in their favor.   [DE 142 at 19-21].

[10] Defendants point out that one of the alleged statements, the second alleged statement of misrepresentation, is not supported by the record evidence. Instead, the record evidence establishes that Plaintiffs did not attend the meeting with Antoniades where the misrepresentations supposedly were made. [DE 73 ¶ 52; DE 83 at 14; DE 108 at 10]. However, Plaintiffs did not separate each alleged misrepresentation into separate counts, and the allegation of misrepresentation does not rise and fall on the second alleged statement.

favor. Specifically, Plaintiffs put forth evidence that the no-action letter did not require the cancellation of the Legacy Program; the true motivations of Defendants' were withheld to promote the sale of Legacy for a better price; Defendants paid Legend's CEO to rubberstamp Defendants' decision to cancel the Legacy Program; Defendants made statements to Plaintiffs to induce John to accept cancellation of the Program as a regulatory matter and to accept less than what he was owed and forgo other options; and these statements were made when it was known that John was vulnerable and in a diminished state. *See, e.g.*, DE 163 ¶¶ 116-159; Ex. 3, Decl. Sander Ressler; Ex. 2, Decl. Mark Spinello; Ex. 1, Decl. James; Ex. 4, Decl. John; Ex. 11, Depo. Steve Fisher; Ex.8, Depo. Shashi Mehrotra; Ex. 17, Lincoln Purchase Agreement.   In short, Plaintiffs' counts of misrepresentation are central to this case, genuinely disputed, and the merits of the allegations will be determined by a jury.

### D.  Constructive Fraud

Plaintiffs allege that Defendants are liable for constructive fraud, conspiracy to commit constructive fraud, and aiding and abetting constructive fraud. [DE 73 ¶¶ 95–113]. Specifically, Plaintiffs allege that Legend's business relationship with Plaintiffs was one based on confidence and trust established through Legend's assumption of the role of joint possessor, protector, advisor and custodian of the value of Plaintiffs' book of business under the Program. *Id.* ¶ 95. Legend solicited, benefitted from and accepted a protective and advisory role as to the assets that Plaintiffs' book represented. John also reposed confidence in Fisher, as acting principal and president of the Branch of which Plaintiffs held a majority interest, and Fisher accepted John's trust. *Id.*   As such, Legend and Fisher stood in a confidential relationship with Plaintiffs and Defendants knew of this relationship.

Plaintiffs allege that Legend breached its fiduciary duty to John by failing to exercise diligence over the maintenance of John's license, failing to properly ensure compliance with regulatory standards on which John and James' financial security depended, failing to pay overrides to John in 2016, ordering the pretextual cancellation of the Program, fraudulently and coercively procuring release agreements from John, failing to restore control of the Branch to Plaintiffs, and failing to properly notify Lincoln of Legend's then-existing obligations to Plaintiffs. *Id.* ¶ 96.   Fisher breached his fiduciary duty by participating in and helping plan the cancellation of the Program without disclosing his divided loyalty, assisting in Legend's coercive efforts to obtain a release from John, and resisting and refusing John's request to restore control of Branch management to James. *Id.* Defendants were directly involved in the cancellation of the Program, the use of fraudulent statements to procure John's release and acquiescence to the cancellation and the enlistment of Fisher to violate his duty of loyalty to Plaintiffs.  *Id.* ¶ 97.   These acts were committed through Legend at the express direction of Antoniades, acting on his own and on Cetera's behalf. *Id.* Legend and Fisher acted as the agents of Cetera, and under the control, authorization, and order of Antoniades. *Id.*   Defendants exercised complete control over Legend's executive officers in the year preceding Program cancellation. *Id.*

Defendants argue that the constructive fraud causes of action fail as a matter of law because Legend was not in a fiduciary relationship with Plaintiffs and thus owed them no fiduciary duty. Defendants assert that no evidence exists that Fisher was acting as an agent of Defendants when he allegedly violated his fiduciary duty to Plaintiffs. As to the conspiracy count, it also fails because no evidence exists that an agreement existed between Defendants and Fisher to fraudulently procure the release from John or "take Plaintiffs' business" by opening a competing

branch, as Plaintiffs allege. As to the aiding and abetting count, it also fails because no evidence exists that Defendants provided substantial assistance to Fisher, as Plaintiffs allege.

"Constructive fraud exists where a duty arising from a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken. . . . Florida courts have construed the term 'fiduciary or confidential relation' as being very broad." *Kelly v. Nelson, Mullins, Riley & Scarborough, L.L.P.*, No. 08:01–cv–1176–T–27–MAP, 2002 WL 598427, at *8 (M.D. Fla. Mar. 20, 2002); *see also Cordero v. Transamerica Annuity Serv. Corp.*, 452 F. Supp. 3d 1292, 1302 (S.D. Fla. 2020).

The Court finds that Defendants have not met their burden here. There is sufficient record evidence to support Plaintiffs' constructive fraud claims on summary judgment.  As discussed *supra*, the relationship between the parties is squarely at issue in this case and is highly disputed. Whether there was a fiduciary relationship between Plaintiffs and Legend, and whether Legend and Fisher were acting at Defendants' direction and "under the control, authorization and order of Antoniades", must be determined by a jury in this case.   As detailed *supra,* there is evidence that the Legend CEO surrendered his discretion at the direction and on behalf of Defendants, the Legend CEO cancelled the Legacy Program at Defendants' direction and submitted releases to John at Defendants' direction. Accordingly, the constructive fraud counts do not fail as a matter of law and will be determined by the jury at trial.

### E.  Exploitation of Elderly Persons

Plaintiffs allege claims for exploitation of an elderly person under Sections 772.11 and 825.103, Florida Statutes. Under Section 825.103, a person exploits an elderly person by:

Knowingly obtaining or using, or endeavoring to obtain or use, an elderly person's

38

or disabled adult's funds, assets, or property with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult, by a person who:

> 1. Stands in a position of trust and confidence with the elderly person or disabled adult; or
> 2. Has a business relationship with the elderly person or disabled adult;

§ 825.103, Fla. Stat. A business relationship is "a relationship between two or more individuals or entities where there exists an oral or written contract or agreement for goods or services." § 825.101(1), Fla Stat.   A "position of trust or confidence" means a person with "a legal or fiduciary relationship with the elderly person[.]" § 825.101(10)(c), Fla. Stat.

Section 825.103 "is a criminal statute and does not provide a private right of action." *Ginder v. Bank of Am. Corp.*, No. 6:14-CV-1271-ORL-40, 2015 WL 898595, at *4 (M.D. Fla. Mar. 3, 2015). However, Section 722.11, Florida Statutes, the civil remedy for theft or exploitation, provides:

> Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss. 812.012-812.037 or s. 825.103(1) [exploitation of an elderly person or disabled adult] has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts. Before filing an action for damages under this section, the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section. If the person to whom a written demand is made complies with such demand within 30 days after receipt of the demand, that person shall be given a written release from further civil liability for the specific act of theft or exploitation by the person making the written demand . . . . Punitive damages may not be awarded under this section . . . .

§ 772.11(1), Fla. Stat.

Defendants argue that these counts fail as a matter of law because Plaintiffs admit that they

had a business relationship with Legend rather than Defendants; Defendants did not have a "legal or fiduciary relationship" with John; and Plaintiffs cannot satisfy the condition precedent of making a pre-suit demand that complies with the requirements of Section 772.11(1), Florida Statutes.[11]

Defendants have not met their burden on summary judgment here. Again, the relationship between Plaintiffs and Defendants is hotly contested here. The evidence supports Plaintiffs' position that Defendants asserted control over the relationship between Legend and Plaintiffs, and that Defendants entered the business relationship between Legend and John. Whether there was a fiduciary and/or a business relationship between Defendants and Plaintiffs is genuinely disputed and there is record evidence that Defendants essentially used Legend's CEO as an alter-ego to cancel the Program to achieve their own ends by exploiting John. Accordingly, Plaintiffs' elder exploitation claims based on an alleged legal or fiduciary relationship does not fail as a matter of law, and these counts will be determined by the jury at trial.

## VII.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Suggestion Of Death and Motion to Substitute Party on November 12, 2021

---

[11] It is uncontested that Plaintiffs sent a pre-suit demand to Defendants which Defendants rejected. [DE 142]. Defendants now argue that they are entitled to summary judgment in their favor because the pre-suit demand amount was based on estimated damages and not actual damages. As this Court previously advised, the demand letter "is not central to Plaintiffs' elder abuse claim." [DE 69 (citing *SOS Furniture Co., Inc. v. Salem*, No. 618CV898ORL37KRS, 2019 WL 279887, at *4 (M.D. Fla. Jan. 22, 2019) ("The Court rejects Morad's invitation to consider the Demand Letter because it is not central to SOS's claim for civil theft. Crucial to this determination is the distinction between a document central to a plaintiff's claim and a document central to a defendant's affirmative defense."))]. Plaintiffs clearly sent a pre-suit demand to Defendants, and a determination is not appropriate at this time as to whether the demand is sufficient to entitle Plaintiffs to treble damages in the event they prevail on this claim at trial.

[DE 200] is **GRANTED**. As such, James Drewes, as Trustee of the Drewes Family Trust, shall be substituted as the proper party plaintiff on behalf of John Drewes. The Clerk of Court is **DIRECTED** to amend the style and record in this matter accordingly.

2. Defendants' Motion to Disregard the declaration of Mark Spinello [DE 181] is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted to the extent that the Court has disregarded the declaration of Mark Spinello to the extent his statements are legal opinions or are otherwise inadmissible. The Motion is denied in all other respects.

3. Plaintiffs' Motion for Partial Summary Judgment and/or Motion To Strike Defendants' First, Second, Fifth, Eighth and Ninth Defenses in Defendants' Answer and Defenses to Third Amended Complaint [DE 139] is **DENIED**.

4. Defendants' Motion for Summary Judgment [DE 142] is **DENIED**.

5. All pending issues shall be resolved at the upcoming jury trial where the trier of fact will have an opportunity to hear and consider all the relevant and probative evidence and make credibility determinations.

6. This case is specially set for a jury trial beginning on **January 18, 2022, at 9:00 a.m.** before United States Magistrate Judge William Matthewman at the U.S. Courthouse located at 701 Clematis Street, West Palm Beach, Florida. [DE 153]. The parties and their counsel shall be ready and present for the jury trial at that time. The parties are also reminded that a calendar call is set for **2:00 p.m. on January 12, 2022**, before the

undersigned.[12]   [DE 153]. The parties are reminded that their Joint Pretrial Stipulation, Proposed Jury Instructions, and Proposed Verdict Form are due on January 5, 2022; the parties' Exhibit List and Witness List are due on January 7, 2021. [DE 208].[13]

   **DONE and ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 7th day of December 2021.

WILLIAM MATTHEWMAN
United States Magistrate Judge

---

[12] This calendar call shall proceed via Zoom VTC. The undersigned's Courtroom Deputy, Ken Zuniga, will, at a later time, email instructions for accessing the Zoom VTC calendar call to counsel.

[13] If the parties believe in good faith that a Settlement Conference before a United States Magistrate Judge will assist them in potentially resolving this case, they may file a joint motion requesting a Settlement Conference to be held in person or via Zoom VTC before a U.S. Magistrate Judge, and the Court will attempt to locate a U.S. Magistrate Judge available to conduct the Settlement Conference. The parties are also free to schedule a further mediation session with a private mediator. However, any settlement efforts or settlement scheduling will not be sufficient good cause to continue the scheduled January 18, 2022 specially set trial as the Court fully intends to adhere to that trial date.